**In the United States District Court**
**For the Southern District of New York**

SeanPaul Reyes
*Plaintiff*

v.

The City of New York,
*Defendant*

**COMPLAINT**

23-cv-6369

Plaintiff SeanPaul Reyes brings this action against the City of New York by alleging the following:

**Preliminary Statement**

1. SeanPaul Reyes is an independent journalist who records his encounters with public officials who are performing public duties. He does so to educate others on what to expect from such encounters and as an expression of his First Amendment rights.

2. Plaintiff publishes his journalism on YouTube under the name "Long Island Audit."

3. Plaintiff files this action to challenge the New York Police Department's ("NYPD") unlawful policy of arresting individuals for trespassing when they record police officers within the publicly accessible areas of NYPD facilities (the "Trespass Policy").

4. Plaintiff, like others before him, was arrested for recording police officers engaged in police conduct in a public forum.

5.      While waiting quietly in line in the lobby of the Sixty-First precinct for a complaint form, Plaintiff was approached by a sergeant, and then a police officer, who told him that recording in precinct lobbies was banned by the NYPD. When he refused to leave the precinct or stop recording, he was arrested.

6.      The NYPD's patently illegal policy of prohibiting recording in precincts reflects the department's hostility towards transparency and accountability.

7.      Plaintiff seeks to have this illegal policy enjoined; he seeks no money damages.

## Jurisdiction and Venue

8.      Jurisdiction is proper over Plaintiff's § 1983 First Amendment claims under 28 U.S.C. § 1331.

9.      Jurisdiction is proper over Plaintiff's claims under New York City and New York State Law pursuant to 28 U.S.C. § 1367(a) because these claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a)(1).

10.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because Defendant the City of New York resides in this district.

11.     Because Plaintiff seeks solely injunctive relief, and because Plaintiff brings this lawsuit in the public interest, he is not required to file a Notice of Claim.

## Parties

12.     Plaintiff SeanPaul Reyes is an adult resident of Suffolk County, New York.

13.     Defendant City of New York ("City") is a municipal entity created and organized under the laws of the State of New York. The City is responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and is responsible for the appointment, training, supervision, discipline and retention, and conduct of all NYPD personnel. The City is responsible for ensuring that NYPD personnel obey the laws of the United States, the State of New York, and the City of New York.

## Statement of Facts

*Plaintiff Is a Journalist Who Documents Public Officials in Public Spaces*

14.     SeanPaul Reyes is an independent journalist who investigates and documents government conduct.

15.     Plaintiff travels to government buildings and other public spaces to conduct public business. He records his interactions with public officials in those places and publishes the resulting videos.

16.     He does this work to show his viewers various police practices, to exercise his right to record government agents engaged in government conduct, and to protect the rights of others to record public officials.

17.     Plaintiff posts his videos on his YouTube channel, where he goes by the moniker "Long Island Audit." His YouTube channel is available here:

https://www.youtube.com/c/longislandaudit.

*18.*     Sometimes, his recordings show government agencies allowing him to conduct public business with them while recording them. For example, in Pooler, Georgia Plaintiff entered police headquarters and filed a complaint against the chief of police, all while recording his actions, without incident. *See*

*https://www.youtube.com/watch?v=MI_nqjTfrT4*.

19.     Sometimes, however, his recordings show officers denying him his lawful right to record, and instead removing him from buildings and, as set forth below, subjecting him to unlawful arrest. *See https://www.youtube.com/watch?v=vrrbLfBnmkQ*.

20.     Over the course of more than two years, Plaintiff has posted close to 300 videos on his channel and amassed over 500,000 subscribers.

21.     More recently, he has posted videos recorded by others that show law enforcement engaged in misconduct. *See* https://www.youtube.com/watch?v=vzXhQ-kMLZ8&t=23s.

22.     Plaintiff's conducts his journalism principally to protect the rights of others to record law enforcement officers engaged in misconduct.

*Civilian Recordings Have Revealed Outrageous Officer Misconduct, Including Murder*

23.     Over the past fifteen years, recordings of law enforcement officers by civilians have revolutionized the way the public understands policing. Outrageous acts of misconduct, including murder, have been exposed solely through the vigilant actions of civilians armed only with a recording device.

24.     For example, in 2006, a digital audio recording of a lengthy interview secretly made inside an NYPD precinct by Erik Crespo was used to prove that Detective Cristopher Perino perjured himself when he testified repeatedly under oath that he had not interviewed Crespo at all. *See* Jim Dwyer, *A Switch is Flipped, and Justice Listens In*, N.Y. Times (Dec. 8, 2007), https://www.nytimes.com/2007/12/08/nyregion/08about.html.

25.     And in 2014, NYPD Detective Kevin Desormeau was prosecuted for perjury after a video recording showed he falsified an arrest and lied about it on the stand. *See* Joseph Goldstein & John Surico, *New York Detective Guilty of Lying About Drug Arrest*, N.Y. Times (Jan. 24, 2018), https://www.nytimes.com/2018/01/24/nyregion/new-york-detective-desormeau-perjury.html.

26.     Likewise, recordings have led prosecutors to drop charges, as when NYPD Officer Nector Martinez falsely testified that he entered and searched an apartment only after the resident set a gun down in the hallway but then a recording showed that he simply (and unlawfully) forced his way inside. *See* Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times (Mar. 18, 2018), https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

27.     A civilian recorded Police Officer Daniel Pantaleo using an illegal chokehold on Eric Garner, purportedly because Mr. Garner had been selling loose cigarettes. That recording was used in the administrative trial that resulted in Pantaleo's termination.

*See* The City of New York Police Department Report and Recommendation, *In the Matter of the Charges and Specifications against Police Officer Daniel Pantaleo*, No. 2018-19724, pp. 17–18.

28.     And one recording sparked a movement: a recording by a civilian bystander of then Police Officer Derek Chauvin killing George Floyd in Minneapolis in 2020 not only ignited a national uprising against police violence but also provided crucial evidence in the successful murder trial of officer Chauvin. *See State v. Chauvin*, No. 27-CR-20-12646 (Minn. Dist. Ct., Hennepin Cnty. June 25, 2021).

29.     Recording the police has become a crucial accountability and safety tool, particularly for marginalized communities. Any interaction in which a person cannot independently record law enforcement is inherently unsafe.

*The NYPD Has a Long-Standing Hostility Towards Those Who Record Them*

30.     The NYPD has a long history of hostility towards those who record its officers, particularly those who record officers for the purpose of holding them accountable.

31.     Prior to 2016, the NYPD had an unconstitutional policy to arrest anyone who attempted to record police activity.

32.     For example, when a bystander witnessed Officer Jonathan Muñoz conducting an illegal search in 2014, he started to record. In response, the officer grabbed the bystander's phone, arrested him, and once he was in the back of a police car, threw the phone out the window. Nathan Tempey, *A Friendly Reminder That It's Legal to Film the*

*Police*, Gothamist (Apr. 29, 2015), https://gothamist.com/news/a-friendly-reminder-that-its-legal-to-film-the-police.

33.     A civilian who, like Plaintiff, had been arrested for filming police officers in public challenged the NYPD's illegal policy in *An v. City of New York*.

34.     As part of the settlement in that case, the NYPD issued PG 203-29, which generally confirms that people can record police engaged in police activity in public. The Stipulation of Settlement is attached as **Exhibit A** to this complaint, and the June 12, 2018 version of PG 203-29 is attached as **Exhibit B**.

35.     Notably, PG 203-29 also includes a provision purporting to allow NYPD officers to arrest individuals who are "photographing and recording within Department facilities" for trespassing (the "Trespass Policy"). *See* PG 203-29(7), **Ex. B**.

36.     That provision reads:

> Members of the public are not allowed to photograph and/or record police activity within Department facilities. Members of the service may order any member of the public who is photographing or recording within Department facilities to stop such activity. If such person refuses to stop, then they should be ordered to leave the premises. If such person refuses to leave the premises, members of the service may take proper enforcement action under the trespass statutes (*i.e.*, Penal Law section 140.05 and 140.10).

*The NYPD Barred Recording in Precincts Based on a Single Isolated Incident*

37.     Soon after issuing PG 203-29, the NYPD began acting on the Trespass Policy and publicly announcing that it was doing so.

38.     On August 13, 2018, a man recorded himself shouting obscenities at officers

within the 28th Precinct. The next day, he posted the video on a social media site, and

by August 16, the NYPD claimed that it had circulated a memo codifying the Trespass

Policy. *See* Tina Moore & Amanda Woods, *NYPD Bans Civilians from Recording Video

Inside Precincts*, N.Y. Post (Aug. 18, 2018), https://nypost.com/2018/08/18/nypd-bans-

civilians-from-recording-video-inside-precincts/.

39.     The NYPD has acknowledged the existence of the memo but has not released it

publicly. *See* Ashley Southall, *Video of Man Berating Officer Opens Debate Over Recording

in Police Stations*, N.Y. Times (Aug. 21, 2018),

https://www.nytimes.com/2018/08/21/nyregion/recording-in-police-stations-new-

york.html.

40.     The NYPD has posted signs in nearly every precinct, if not every precinct, stating

that recording in precincts is prohibited. These signs read: "MEMBERS OF THE

PUBLIC ARE PROHIBITED FROM AUDIO OR VIDEO RECORDING OR

PHOTOGRAPHING THIS FACILITY."

41.     Since 2018, the NYPD has continued to arrest those who record police activity

inside the publicly accessible areas of NYPD precincts.

42.     The Trespass Policy, codified in PG 203-29(7), the signs themselves, or both, were

not promulgated pursuant to the notice-and-comment provisions of the Citywide

Administrative Procedure Act. *See* 45 N.Y. City Charter § 1041 *et. seq.*

*The City Council Passes the Right to Record Act*

43.     After the *An* settlement, and even after issuing PG 203-29, the NYPD regularly

retaliated against those who record officers.

44.     For example, when a Bronx high schooler started recording officers who were

arresting her cousin in 2018, the officers turned on her and arrested her for gun

possession, a charge that subsequent video proved was concocted. *See* Amended

Complaint, *Pagan v. City of New York*, No. 25402/2020E at 13 (Sup. Ct., Bronx Cnty., Jul.

21, 2022), Doc. 136.

45. In 2017, the CCRB reported that it had substantiated 96 of the 257 investigations into

interference with recording by officers of the NYPD, a substantiation rate much higher

than its overall substantiation rate. New York City Civilian Complaint Review Board,

Worth A Thousand Words: Examining Officer Interference with Civilian Recording

(June 2017),

https://www.nyc.gov/assets/ccrb/downloads/pdf/20172806_report_recordinginterferenc

e.pdf.

46.     Relying on this report and the continued stories of interference with recording—

inside and outside of precincts—the New York City Council passed the Right to Record

Act, which Mayor de Blasio signed on June 18, 2020.

47.     When the law was passed, Donovan Richards, then the chair of the Public Safety

Committee of the City Council, emphasized that the purpose of the law was to remove

decision-making authority from the NYPD. He told the voting members that "We need you to say that the NYPD cannot decide how we are going to police this city." Transcript of the Minutes of the New York City Council Committee on Public Safety, June 18, 2020, at 7:8–11.

48.     The Right to Record Act's plain language reads: "A person may record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording." N.Y.C. Admin. Code § 14-189(b).

*The NYPD Bars Recording to Protect Its Officers from Accountability*

49.     Despite the clarity of the Right to Record Act's language, the NYPD doubled down on its rule against recording in precincts.

**50.**     The NYPD subsequently codified the Trespass Policy in the NYPD Administrative Guide. *See* NYPD Administrative Guide Procedure 304-21(7), attached as **Exhibit C.**

51.     The NYPD bars recording in precincts to control footage of civilian-officer encounters, and not for any stated public safety purpose.

52.     The NYPD already records nearly everything that goes on inside the publicly accessible areas of a precinct, including all encounters with members of the public in such areas. Most, if not all, precinct lobbies have fixed interior video cameras, and officers are equipped with body-worn cameras ("BWC") that must be turned on when interacting with the public pursuant to Patrol Guide Procedure 212-123.

53.     But those videos are rarely used to hold officers accountable. While body-worn

cameras are meant to record police activity to help identify acts of misconduct and

abuse, the NYPD has refused to provide sufficient access to BWC footage to

independent investigators for years.

54.     In 2020, the NYPD only responded to 33 of the 212 requests for BWC footage

made by the CCRB. *See* Eric Umansky, *The NYPD Isn't Giving Critical Bodycam Footage to*

*Officers Investigating Alleged Abuse*, ProPublica (July 3, 2020).

55.     A year later, the Department of Investigation issued a report outlining the

failures of the NYPD to provide BWC footage to the CCRB and recommended

providing CCRB direct access to BWC footage. *See* New York City Department of

Investigation, Sharing Police Body Worn Camera Footage in New York City (Nov.

2021).

56.     Since the *An* settlement in 2018, the CCRB has substantiated many cases of

officers interfering with the right to record and forwarded these cases to the NYPD. Of

those that it chose to punish at all, the NYPD rarely if ever issued a penalty more

serious than the loss of a few vacation days. Most of the time, the officers received only

command discipline or instructions, or were not penalized at all.

57.     Given the NYPD's unlawful policy, New Yorkers can no longer be certain that

the NYPD's recordings will be used for their intended purpose—holding police officers

accountable.

58.     Instead, the NYPD mainly uses BWC footage as evidence against those it subjects

to criminal arrest. In 2018 and 2019, while the CCRB was struggling to obtain a few

dozen videos, the NYPD provided 140,000 videos to the Brooklyn District Attorney's

Office. *See* Ethan Geringer-Sameth, *Vast Difference in NYPD Provision of Body Camera*

*Footage to District Attorneys Versus Police Watchdog*, Gotham Gazette (Nov. 12, 2019).

59.     Plaintiff's journalism and activism protect those who seek to exercise their right

to record officers in public. His work recording law enforcement officers and others is in

service of those who record the outrageous misconduct.

*Plaintiff Was Arrested by Officers of the Sixty-First Precinct When They Failed His Audit*

60.     On April 4, 2023, Plaintiff sought to peacefully exercise his First Amendment

right to film in public and publicly accessible areas, to promote transparency and

accountability within our government, and to ensure that our public servants recognize

our rights and treat us with respect.

61.     On that day, Plaintiff chose file a complaint at the Sixty-First Precinct, a facility of

the NYPD located at 2575 Coney Island Avenue, Brooklyn, NY (the "061"). He chose to

record the incident, as he does regularly, to document to his viewers the process of

obtaining a complaint form and filing a complaint with the NYPD.

62.     Plaintiff began recording a video before he entered the 061 and continued to

record until he was arrested and his equipment was confiscated. He later posted a

version of this video, along with other video clips, on his YouTube channel, available

here: https://www.youtube.com/watch?v=ULjtPKeh9Co.

63.    Plaintiff entered a small waiting area, accessible to the public, where a line of

people waited to speak with an NYPD representative who sat behind a glass barrier. A

door led from the waiting area into the precinct proper. A uniformed police officer

occasionally opened the door to speak with waiting civilians.

64.    Plaintiff took his place in line to wait for his turn at the window.

65.    Shortly thereafter, NYPD Sergeant Tosares Korchimet (Badge No. 256) came

through the door and gestured to Plaintiff. Sgt. Korchimet pointed to a sign in the

window of the booth, which read "MEMBERS OF THE PUBLIC ARE PROHIBITED

FROM AUDIO OR VIDEO RECORDING OR PHOTOGRAPHING THIS FACILITY."

66.    Sgt. Korchimet told Plaintiff to stop recording. Plaintiff asked for the Sergeant's

name and badge number and Sgt. Korchimet provided it.

67.    Sgt. Korchimet then said, "I'm letting you know that you can't do that here."

When asked to clarify, he said "you cannot record video inside the precinct." Plaintiff

asked why he could not record, and Sgt. Korchimet again referred him to the sign.

Plaintiff asked what the purpose of the sign was, and the Sergeant left the publicly

accessible area of the precinct.

68.    A few moments later, Sgt. Korchimet arrived with another officer, Police Officer

Giovanni Cucuzza (Badge No. 259), who instructed Plaintiff that "you gotta leave," and

that "if you don't leave, you're gonna get arrested." Plaintiff asked PO Cucuzza for his name and badge number and PO Cucuzza provided them.

69.     PO Cucuzza then directed Plaintiff to the sign. PO Cucuzza read the sign aloud while pointing to it. PO Cucuzza then said, "so if you don't stop recording and leave, that's a warning, right?"

70.     Plaintiff informed the officers that he was waiting in line for a complaint form. Both officers then reiterated that they would arrest him if he did not stop recording them.

71.     Plaintiff asked to speak to a supervisor, and PO Cucuzza noted that Sgt. Korchimet was a supervisor. Plaintiff asked to speak to Sgt. Korchimet's supervisors.

72.     At this point, Sgt. Korchimet and PO Cucuzza instructed Plaintiff to put his hands behind his back and stated that they were placing him under arrest. The recording then ends.

73.     PO Cucuzza arrested Plaintiff and issued him a Desk Appearance Ticket. A true and accurate copy of the Desk Appearance Ticket is attached hereto as **Exhibit D**. Plaintiff was held in the 061 for over six hours before he was released.

74.     Plaintiff was charged with violating New York Penal Law 104.50.

75.     The Brooklyn District Attorney's office wrote to Plaintiff to confirm that it had declined to prosecute his arrest on May 10, 2023. A copy of that letter is attached as **Exhibit E**.

76.     Plaintiff was arrested pursuant to the Trespass Policy, which instructs officers to arrest anyone recording inside an NYPD Precinct, even in the publicly accessible areas, if that person refuses to stop recording or exit the precinct.

77.     The Trespass Policy is codified in the NYPD Patrol Guide, the NYPD Administrative Guide, and the sign in the window of the precinct lobby. Both officers confirmed to Plaintiff that they were arresting Plaintiff because he was recording and confirmed that recording inside a precinct lobby is barred by the NYPD.

78.     Plaintiff will continue to enter and record in the public areas of NYPD precincts. Doing so without an order from the Court confirming that such actions are legal would subject him to future unlawful arrests.

79.     Plaintiff was subsequently arrested for recording inside an NYPD precinct. On June 1, 2023, he was arrested and charged with Criminal Trespass and Obstructing Governmental Administration. The events of June 1, 2023 do not form the basis for Plaintiff's claims but do confirm that the threat of re-arrest should he choose to exercise his rights again is real.

80.      Plaintiff seeks injunctive relief directed at the NYPD's future course of conduct.

*Plaintiff Is Entitled to Injunctive Relief*

81.     Plaintiff is likely to suffer irreparable harm if the NYPD continues to enforce the Trespass Policy.

Page 15

82.     Plaintiff is an independent journalist who documents himself exercising his First Amendment rights in publicly accessible spaces.

83.     Plaintiff's journalistic obligations require him to visit publicly accessible spaces—including NYPD precincts—and record his encounters with public officials.

84.     If the NYPD is not enjoined from enforcing the Trespass Policy, Plaintiff will face continued arrest if he attempts to exercise his First Amendment rights, which is akin to having those rights denied.

85.     Plaintiff's harm is imminent, ongoing, and constitutional—he cannot exercise his First Amendment rights without fear of arrest.

86.     There is no public interest in denying people's First Amendment rights.

**First Cause of Action**

**42 U.S.C. § 1983 – First Amendment –** *Monell* **Policy or Practice**

87.     Plaintiff re-alleges each paragraph above as though fully stated herein.

88.     The NYPD has an official policy prohibiting recording of photographing inside NYPD facilities, including the publicly accessible areas of precincts (the "Trespass Policy").

89.     The Trespass Policy is codified Patrol Guide 203-29(7). *See* **Ex. B.**

**90.**     The Trespass Policy is further codified in the Administrative Guide at Procedure 304-21(7), which contains the same text as PG 203-29(7). *See* **Ex. C.**

91.    The Trespass Policy is likewise codified in signs that are posted in most, if not all, precincts that read as follows: "MEMBERS OF THE PUBLIC ARE PROHIBITED FROM AUDIO OR VIDEO RECORDING OR PHOTOGRAPHING THIS FACILITY."

92.    NYPD officers were and are trained to arrest those recording in the publicly accessible areas of NYPD precincts.

93.    The Trespass Policy is a blanket prohibition on recording inside NYPD facilities.

94.    The Trespass Policy deprives Plaintiff, and deprives many others, of their First Amendment rights to record NYPD officers in publicly accessible areas of NYPD facilities.

95.    The Trespass Policy is viewpoint discriminatory, is not content-neutral, and is not narrowly tailored to protect a legitimate government interest.

96.    The Trespass Policy does not contain any exceptions or tailoring to protect or recognize any legitimate interest in recording in the publicly accessible areas of precincts.

97.    The Trespass Policy authorizes the arrest of individuals in retaliation for exercising their First Amendment rights.

98.    The Trespass Policy chills the First Amendment rights of those who refrain from recording and denies the First Amendment rights of those who choose to exercise them in the publicly accessible areas of NYPD facilities.

99.    The Trespass Policy was enacted to limit First Amendment activity by members of the public and not for any legitimate law enforcement purpose.

100.    The Trespass Policy is enforced by NYPD officers acting under color of state law.

101.    PO Cucuzza and Sgt. Korchimet were acting pursuant to the Trespass Policy on April 4 when they 1) told Plaintiff he could not record in the precinct, 2) told Plaintiff to leave the precinct when he refused, and 3) arrested Plaintiff when he refused to leave the precinct.

102.    As a result, Plaintiff was deprived of his liberty and his First Amendment rights, spent hours in jail, and suffered pain and emotional injury.

103.    Plaintiff's rights are currently being chilled by the Trespass Policy, as he is refraining from exercising his First Amendment rights under the very real fear of future arrest.

**Second Cause of Action**

**42 U.S.C. § 1983 – First Amendment**

104.    Plaintiff re-alleges each paragraph above as though fully stated herein.

105.    Plaintiff's right to record police activity in public and publicly accessible places is protected by the First Amendment. He was exercising that right within the 061 on or about April 4, 2023.

106.    PO Cucuzza arrested Plaintiff on or about April 4, 2023 in retaliation for his protected First Amendment activity.

107.   PO Cucuzza and Sgt. Korchimet engaged in viewpoint discrimination and retaliation by arresting Plaintiff for exercising his First Amendment Rights.

108.   PO Cucuzza and Sgt. Korchimet's actions were not narrowly tailored to any governmental interest.

109.   At all relevant times PO Cucuzza and Sgt. Korchimet were employees of the NYPD acting within the scope of their official duties and were state actors acting under color of state law.

110.   Plaintiff's arrest was motivated or substantially caused by his exercise of his First Amendment right to record police performing their official duties in public.

111.   PO Cucuzza arrested Plaintiff specifically because Plaintiff was exercising his First Amendment right to record public officials, and thereby deprived Plaintiff of a constitutional right.

### Third Cause of Action

### Citywide Administrative Procedure Act

112.   Plaintiff re-alleges each paragraph above as though fully stated herein.

113.   The NYPD first issued the Trespass Policy through Patrol Guide Order 203-29, issued in June 2018 as part of the settlement in *An v. City of New York*.

114.   The NYPD did not undergo the rulemaking process set forth in the Citywide Administrative Procedure Act ("CAPA") when it first issued the Trespass Policy.

115.   The Trespass Policy was further set forth in a 2018 NYPD memorandum.

116.    The NYPD did not undergo the rulemaking process set forth in CAPA before issuing this memorandum.

117.    The Trespass Policy qualifies as a rule pursuant to CAPA, and therefore the NYPD was required to undergo the CAPA process before issuing it.

118.    The Trespass Policy is currently codified at Administrative Guide Procedure 304-21(7).

119.    The NYPD has never undergone the rulemaking process to enact the Trespass Policy.

120.    The Trespass Policy is therefore null and void pursuant to CAPA.

**Fourth Cause of Action**

**New York City Right to Record Act**

**New York City Administrative Code § 14-189(c)**

121.    Plaintiff re-alleges each paragraph above as though fully stated herein.

122.    The New York City Right to Record Act provides a private cause of action to those whose right to record police activity is unlawfully interfered with. N.Y.C. Admin. Code § 14-189(c).

123.    On April 4, 2023, Plaintiff attempted to record police activities in accordance with N.Y.C. Admin. Code § 14-189(b).

124.    Officers of the NYPD interfered with his right to record by instructing him to stop recording or leave the precinct, threatening him with arrest if he continued to

record officers, and arresting him when he continued to record. *See* N.Y.C. Admin. Code §§ 14-189(c)(1)(a)–(d).

### Fifth Cause of Action

### Unlawful Interference with Recording Law Enforcement

### Civil Rights Law § 79-p

125.     Plaintiff re-alleges each paragraph above as though fully stated herein.

126.     Plaintiff brings this cause of action pursuant to New York Civil Rights Law § 79-p(3) for interfering with his right to record law enforcement activity.

127.     On or about April 4, 2023, Plaintiff exercised his right to record law enforcement activity as set forth in New York Civil Rights Law § 79-p(2) within the publicly accessible areas of the Sixty-First Precinct in Brooklyn, New York.

128.     PO Cucuzza and Sgt. Korchimet of the NYPD interfered with Plaintiff's right by threatening to arrest him and in fact arresting him when he did not stop recording them.

129.     PO Cucuzza and Sgt. Korchimet were acting pursuant to an NYPD Policy that is ultimately the responsibility of the NYPD and the City of New York. That policy violates the Right to Record Act.

130.     PO Cucuzza and Sgt. Korchimet were acting pursuant to an illegal department policy that continues to be enforced.

**Prayer for Relief**

Plaintiff respectfully requests that this Court grant the following relief:

A.      A preliminary injunction enjoining the NYPD from either 1) enforcing the

Trespass Policy, as defined by Patrol Guide Procedure 203-09(7), Administrative Guide

Procedure 304-21(7), or 2) displaying signs barring recording in precincts currently on

display in precinct lobbies.

B.      After trial, a permanent injunction barring the NYPD from treating the publicly

accessible areas of NYPD precincts any differently than other public spaces under the

New York City and New York State Right to Record Acts.

C.      After trial, a permanent injunction requiring the NYPD to replace the signs that

currently state recording is prohibited in precincts with signs confirming that people

have the right to record police officers performing official duties in the publicly

accessible areas of a precinct.

D.      Costs and attorneys' fees to the extent permitted by any federal, state, or

municipal statute, code, rule, or law.

E.      Such other relief as the Court deems just and proper, except that Plaintiff does

not seek a Declaratory Judgment.

July 24, 2023

                                        Respectfully submitted,


                                        ___/s/ *Andrew Case*_____
                                        Andrew Case
                                        Supervising Attorney
                                        LatinoJustice PRLDEF
                                        475 Riverside Drive #1901
                                        New York, NY 10115
                                        212-790-7506
                                        acase@latinojustice.org