```
 1                 COMMITTEE ON PUBLIC SAFETY         1

 2      CITY COUNCIL
        CITY OF NEW YORK
 3
        ------------------------ X
 4
        TRANSCRIPT OF THE MINUTES
 5
                   Of the
 6
        COMMITTEE ON PUBLIC SAFETY
 7
        ------------------------ X
 8
                         June 9, 2020
 9                       Start:  10:17 a.m.
                         Recess: 8:00 p.m.
10

11      HELD AT:         REMOTE HEARING (VIRTUAL ROOM 1)

12      B E F O R E:     Donovan J. Richards,
                         Chairperson of the Committee on
13                       Public Safety

14
        COUNCIL MEMBERS:
15                       Speaker Corey Johnson
                         Deborah Rose
16                       Carlos Menchaca
                         Brad Lander
17                       Robert Holden
                         Paul Vallone
18                       Adrienne Adams
                         Ydanis Rodriguez
19                       Rafael Salamanca
                         Andrew Cohen
20                       Helen Rosenthal
                         Vanessa Gibson
21                       Farah N. Louis
                         Fernando Cabrera
22                       Andrew Cohen
                         Mark D. Levine
23                       I.Daneek Miller
                         Francisco Moya
24                       Keith Powers
                         Carlina Rivera
25
```

| | |
|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY                           34 |

2      Intro. 721-A also requires the Commissioner to
3  issue quarterly reports of arrests and summonses
4  issued when persons record police activity.
5      There may be no better time to pass legislation
6  as we continue to see people in our city and across
7  this country demand accountability.  If it were not
8  for a quarter of officers, we would know videos of
9  officers hitting a cyclist with batons, officers
10 physically pushing a woman to the ground and officers
11 arresting an essential food delivery worker or many
12 others.  All of these instances were recorded.  I use
13 my own to record instances that were still not
14 believed.
15     Imagine if they were not.  Imagine if we were not
16 aware.  What justice would be sought?  Would the
17 status quo continue?  Sadly, even with the video,
18 sometimes there is no justice.
19     Take the case of Rayne Valentine, an essential
20 worker at Kings County Hospital.  As he left work on
21 May 30th while walking near the church avenue subway
22 station and saw the crowds of protestors and police
23 officers.  Rayne took out his phone to record,
24 leading to shouts from officers to move back.  Rayne
25

```
1                COMMITTEE ON PUBLIC SAFETY                35
2    then was pushed and beaten by officers who quickly
3    stopped and gave him back his phone.
4       Afterward, Rayne bleed from what had happened,
5    went back to the hospital for injuries he sustained.
6    All because he was recording officers.  Before these
7    protests, there were many other examples of police in
8    the city inappropriately responding to recordings.
9    Back in May, while walking her dog a defense attorney
10   saw officers stopping men near Tompkins street and
11   Decatur Avenue.  She began to record the interaction
12   before officers approached her.  While the people
13   stopped by police were let go, the attorney was
14   arrested and detained.
15      There are countless stories of people who were
16   simply recording officers and their right to do so
17   was interfered with by police.  On 2014-2016 CCRB
18   investigated 257 complaints involving officers
19   interfering with video recording.  Most of the
20   complaints involved officers using physical
21   interference to prevent their recording.  This cannot
22   happen.  We must ensure every person is entitled to
23   their right to record a police officer without the
24   fear of repercussions.  This includes journalists and
25   I'm frightened by recent reports that the press is
```

```
1      COMMITTEE ON PUBLIC SAFETY                36
2   being stopped and even arrested for just doing their
3   job.
4       Let's make something very clear, there is no
5   local law that makes it illegal to record the police.
6   In fact, federal and state law allow people to record
7   in a public space.  However, we have seen officers
8   inconsistently respond to recordings of their
9   actions.  We do not need to see images of people
10  arrested while holding our officers accountable.  We
11  do not need officers picking and choosing who gets to
12  record and who does not.  It is time for uniform
13  policy and Intro. 721 would do that.  The right to
14  record can allow a level of accountability in
15  incidents where officers acted inappropriately.  For
16  example, film the last words of Eric Garner in Staten
17  Island after x-official Daniel Pantaleo applied a
18  fatal chokehold.  Even though it took five years for
19  Pantaleo to be fired for causing the death of an
20  innocent man, this incident stressed the points of a
21  right to record.  We still haven't had an account for
22  the other officers to who caused the death and my
23  understanding is Mr. Archer had just been released
24  from jail himself.
25
```

```
1     COMMITTEE ON PUBLIC SAFETY                    50
2        COMMITTEE COUNSEL:  Thank you.  I will call on
3  each of you individually for a response.  Please
4  raise your right hands.
5        Do you affirm to tell the truth, the whole truth
6  and nothing but the truth in your testimony before
7  this Committee and to respond honestly to Council
8  Member questions? Deputy Commissioner Tucker?
9        BENJAMIN TUCKER:  I do.
10       COMMITTEE COUNSEL:  Assistant Chief Pontillo?
11 Assistant Chief Pontillo?
12       SPEAKER JOHNSON:  Committee Counsel, we may have
13 an audio problem with the testimony that's about to
14 be given, there is an echo, which makes it hard to
15 understand their testimony.  So, I don't know if they
16 can attempt to fix that on their end.
17       COMMITTEE COUNSEL:  Deputy Commissioner Tucker,
18 why don't you begin and we'll stop if we have a
19 problem.
20       BENJAMIN TUCKER:  We're still getting an echo, I
21 think.  Oh, that's better.  Alight?
22       COMMITTEE COUNSEL:  That sounds better.
23       BENJAMIN TUCKER:  Well, let's begin.  Good
24 morning Speaker Johnson, Public Advocate Williams,
25 Chair Richards, and Member of the Council.  I am Ben
```

```
1    COMMITTEE ON PUBLIC SAFETY                51
2    Tucker First Deputy Commissioner of the New York City
3    Police Department.  I'm joined today by Assistant
4    Chief Mat Pontillo, and Assistant Deputy Commissioner
5    for Legal Matters Oleg Chernyavsky.
6       On behalf of Commissioner Dermot Shea, I wish to
7    thank the Council for the opportunity to discuss the
8    important moment in our countries and in our city's
9    history and to comment on the bills we incurred here
10   today.
11      At the core of the Departments mission is our
12   obligation to protect the health, safety, and welfare
13   of those that live in, work in, and visit our city.
14   A well trained focused and disciplined team of more
15   than 36,000 officers is vital to this mission.  We
16   are the largest police department in the nation, the
17   most scrutinized.  No police department operates
18   under as much public scrutiny or as many layers of
19   oversight as the NYPD.
20       As we have made clear time and again, the Police
21   Department embraces scrutiny and oversight because it
22   has prompted us to review and reflect upon our
23   policies and practices.  In over the past six and one
24   half years, we have made unprecedented progress in
25   such areas as training, control function, precision,
```

```
 1              COMMITTEE ON PUBLIC SAFETY                52
 2   policing, use of force, investigative encounters, and
 3   discipline.
 4      While I intend to outline some of the reforms we
 5   have implemented during this administration.  In the
 6   interest of time, I have attached a far more
 7   comprehensive list to my testimony for you and the
 8   public to review.  Our job is by no means done.  We
 9   in the policing profession know that we can always
10   improve, that we can always do better, that we must
11   do better.  That is why I am here today to commit to
12   you that we will continue to work with you,
13   advocates, academia, and the public on our collective
14   mission to ensure fair and impartial policing
15   throughout our city.
16      The NYPD will remain in the forefront of this
17   issue, which impacts all New Yorkers.  Over the past
18   three and one half months, the city has been and
19   continues to traumatized by the onset of the
20   coronavirus that has taken us into uncharted
21   territory.  And by the horrific and deeply disturbing
22   murder of George Floyd and the passionate expression
23   of outrage that has driven thousands into our streets
24   seeking justice.
25
```

|    |    |    |
|----|----|----|
| 1  | COMMITTEE ON PUBLIC SAFETY | 53 |

2   There has been a fair amount of conflict in our
3   city recently, so please allow me to share something
4   that I think we can all agree on.  What happened to
5   Mr. Floyd was a great injustice and a shocking
6   tragedy and was certainly deeply disturbing.
7       When police officers start their careers, we take
8   over to protect and serve the public.  I did that
9   when I was a young recruit in the early 70's.  Police
10  Commissioner Shea did it as well in the early 90's.
11  All police officers swear to protect the people of
12  this great city and they strive to fulfill the oath
13  every time they put their uniforms on.
14      What we saw in Minneapolis was simply a betrayal
15  of the oath, of that oath and a gross sterilization
16  of duty.  It's nearly damaged every effort we made by
17  our officers to connect with our communities and
18  build trust without people.  Simply put, it was
19  atrocity fatal to Mr. Floyd and deeply damaging to
20  police community relations here in New York and
21  everywhere in our nation.  Our profession is better
22  than that.  But this is also a time where we can call
23  on, all come together and condemn the lawlessness
24  that has occurred recently.  Over the last several
25  days our city has experienced turmoil.  The right to

```
1              COMMITTEE ON PUBLIC SAFETY                54
2    communicate onto ideas is fundamental to a free
3    society.  The NYPD believes in the importance of the
4    first amendment and the public's right to free
5    expression.  But in demonstrating, counter
6    demonstrating or showing support for a cause, people
7    in groups have the right to peacefully gather.  Law
8    enforcement in turn, has the duty to ensure the
9    safety of the general public while protecting the
10   right of peaceful assembly.
11        When protestors march for a better future, it is
12   an overwhelmingly positive thing for our city.  Yet,
13   unfortunately, the city has also recently experienced
14   looting, burglaries, and the destruction of property.
15   These actions are not peaceful protests.  They have
16   nothing to do with civil disobedience, progress, or
17   reform.
18        They are not about demonstrating against police
19   brutality.  Quite frankly, they are the actions of
20   people who have been solely on taking advantage of a
21   moment in American history to call out the cause of
22   equity and justice that we all uphold and
23   intentionally inflict chaos, mayhem, and injury, just
24   for the sake of doing so.  And I hope we can all come
25   together and condemn these lawless actions.
```

|   |   |   |
|---|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY | 55 |

2     The best majority of our police officers abide by
3 the many laws, policies and procedures and rules
4 governing the policing profession.  Police work and
5 police decision making in the field relies heavily on
6 the discretionary judgement of officers based on
7 their accumulated experience as well as adherence to
8 guiding principles to solve a variety of problems.
9     Public trust is eroded anytime a New York City
10 police officer's conduct does not adhere to the
11 values and standards of the NYPD and the policing
12 profession.
13     As I noted earlier in recent years, the NYPD
14 enacted a series of sweeping reforms designed to
15 build trust and encourage collaboration with New York
16 City communities.  At the heart of these reforms is
17 neighborhood policing, making shift in policy and
18 practice that gave cops the time and the latitude to
19 connect with communities that follow through on local
20 problems and seize the initiative on local crime.
21     I personally led a series of training reforms as
22 we developed a three day course in de-escalation, de-
23 escalating confrontations and avoiding force.
24 Trained our officers in communicating with
25 emotionally disturbed people, prompted a field

| | |
|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY                56 |
| 2 | training program for recruits and rented [INAUDIBLE |
| 3 | 39:55] in fair and impartial policing. We also |
| 4 | established a much more exacting use of enforced |
| 5 | policy to investigate all uses of force and collect, |
| 6 | trap and report forced data as never before. |
| 7 | The Department implemented what is now the |
| 8 | largest police body worn camera program in the world. |
| 9 | 45,000 of our officers now wear those body worn |
| 10 | cameras. |
| 11 | By 2019, reported stops were down from 93 percent |
| 12 | from 2013.  Arrests and criminal summonses fell by |
| 13 | 46.6 percent, and 79.7 percent respectively, by the |
| 14 | end of 2019. |
| 15 | Last year, the NYPD stopped 149,000 fewer people |
| 16 | of color than it did in 2013 and we arrested 148,000 |
| 17 | fewer.  With the smaller enforcement footprint came |
| 18 | deep cuts in crime.  Murders below 300 for the first |
| 19 | time since 1951 and shootings below 800 as well as |
| 20 | 33.4 drop in burglaries. |
| 21 | Greatly reduced enforcement and significantly |
| 22 | lower crime.  It was a triumph of progressive |
| 23 | policing and I ask you to take these accomplishments |
| 24 | and the reforms that helped achieve them into account |
| 25 | as you consider further reforms in our department. |

```
1                  COMMITTEE ON PUBLIC SAFETY                57

2         One of the most important components in winning

3    the public's trust is the credibility of our internal

4    system for discipling this kind of violence by police

5    officers.  If people see the departments discipline

6    system as minimizing or discounting police conduct,

7    they will be far more likely to doubt the legitimacy

8    of any police action.  We recognize that lasting

9    trust cannot be achieve without a far and transparent

10   police process and the process should be that should

11   provide the people we serve with the understanding

12   and insight into how the department addresses their

13   complaints of misconduct and how we ensure without

14   exception our personnel perform with integrity.

15        In the NYPD, we believe that we have a very

16   robust disciplinary process that holds officers

17   accountable and punishes guilty officers

18   appropriately.  But it is crucially important that

19   the public believes it too.  This is one of the

20   reasons why former Commissioner O'Neill convened the

21   external panel of respected criminal justice experts

22   in 2018 to examine our internal discipline process

23   and to make recommendations on how we can improve.

24        Last year, when the Commissioner issued his

25   report, he immediately accepted each and every
```

| | |
|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY                58 |
| 2 | recommendation.  He tasked me with establishing and |
| 3 | leading a working group to implement the |
| 4 | recommendations, a duty that Commissioner Shea and |
| 5 | the entire NYPD leadership continues to embrace. |
| 6 | I would now like to speak about the bills being |
| 7 | heard yet today.  With respect to Proposed Intro. |
| 8 | 536-A, with dealing with criminalize any form of |
| 9 | restraint that restricts the flow of air or blood by |
| 10 | compressing the windpipe, diaphragm, or corroded |
| 11 | arteries on either side of the neck, in the course of |
| 12 | affecting or attempting to affect an arrest.  The |
| 13 | Department can support this legislation with minor |
| 14 | amendments. |
| 15 | As you know, our Patrol Guide as prohibited the |
| 16 | use of chokeholds for decades.  Patrol Guide Section |
| 17 | 22101, which is publicly available on the NYPD's |
| 18 | website, unequivocally and unambiguously forbids any |
| 19 | pressure to the neck, throat or windpipe that may |
| 20 | inhibit breathing.  The quoting from this section, |
| 21 | the primary duty of all members of the service is to |
| 22 | protect human life, including the lives of |
| 23 | individuals being placed in police custody.  Force |
| 24 | maybe used when it is reasonable to ensure the safety |
| 25 | of the member of the service or a third person or |

```
1        COMMITTEE ON PUBLIC SAFETY                    59
2    otherwise protect life or when it is reasonable to
3    place a person in custody or to prevent escape from
4    custody.
5        In all circumstances, any application or use of
6    force must be reasonable under the circumstances.  If
7    the force used is unreasonable under the
8    circumstances it would deeply be deemed excessive and
9    in violation of the department policy.  When
10   appropriate and consistent with personal safety,
11   member of the service will use de-escalation
12   techniques to safely gain voluntary compliance from a
13   subject to reduce or eliminate the necessity to use
14   force.  In situations in which it is not safe for
15   appropriate members of the service will use only the
16   reasonable force necessary to gain control or custody
17   of a subject.
18       The use of deadly physical force against the
19   person can only be used to protect members of the
20   service or the public from imminent serious physical
21   injury or death.
22       This is how officers are trained and this is how
23   the vast majority of arrests are effectually.
24   Reality is that being a police officer is one of the
25   most difficult jobs in the world.  There are few
```

|   |   |   |
|---|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY | 60 |

2    professions where the line staff — those officers on
3    patrol must make myriad of decisions on every day on
4    any given day.  Cops have to make choices, sometimes
5    very quickly every single day.  Some are a split
6    second life and death choices.  We hold our officers
7    to high standards even when making these choices but
8    the decision as to when and how to use force on the
9    ground is extremely complicated and may change second
10   by second as circumstances evolve during the course
11   of an arrest and often do.
12       No two arrests are the same.  When officers must
13   resort to using force, they must be trusted to rely
14   on their training and their experience.  It is
15   critical that officers are able to transition and
16   adapt to the changing circumstance of an encounter.
17   We teach officers to adjust the level of force and
18   response to the subjects changing level of resistance
19   consistent with attendance of the critical decision
20   making model.  It is for these reasons that the New
21   York State Penal law acknowledges an officers right
22   to use reasonable force under certain circumstances.
23       If the officer uses excessive force, the penal
24   law already includes a statue criminalizing, criminal
25   obstruction of breathing and strangulation.

|   |   |   |
|---|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY | 61 |

2   If the officers conduct does not rise to a
3   criminal defense, the Department, as a robust
4   discipline system will hold that officer accountable.
5   However, this bill would criminalize violations of
6   department policy that would not rise to the level of
7   criminality.  The legislation does not require that
8   an officer intentionally use a chokehold.  Rather it
9   criminalizes incidental, unintentional contact with
10  an individual's neck or chest.  Furthermore, by
11  criminalizing the act of an officer putting pressure
12  on an individual's diaphragm, the bill fails to take
13  into account or take account on the particular
14  circumstance of many struggles during the course of
15  arrests.
16     It also appears that the bill would criminalize
17  the rendering of CPR, with chest compressions or the
18  Heimlich maneuver, although that is clearly not an
19  intended consequence of the law.
20     Under the provisions of the bill, it is actually
21  hard to imagine a scenario in which an officer would
22  not open him or herself to criminal liability or
23  discipline when effecting the arrest of a resisting
24  subject.  While we certainly prefer that people
25  submit to arrests peacefully, it is certainly not

```
 1                 COMMITTEE ON PUBLIC SAFETY              62

 2    always the case that they do.  That is the reality

 3    that officers face every day.  The bill can be

 4    operationalized with two simple amendments.  Remove

 5    the word diaphragm and add the word intentional.

 6    While the unacceptable acts we are all trying to

 7    prevent are those that occurred to Mr. Garner and Mr.

 8    Floyd, I ask you all to visualize the officers who

 9    you are in direct with on a regular day, every day.

10    A coordinating officer or a community affairs

11    officer, they will be the officers led away in

12    handcuffs for unintentional contacts during incidents

13    which they've entrust.  Surely, we can agree that

14    these suggestions are not unreasonable.

15        With respect to Proposed Intro. 760-A, the bill

16    would require the NYPD to create and maintain a

17    centralized system to track, review and evaluate

18    police officer activity and to identify officers that

19    may be in need of enhanced training, monitoring or

20    pre-assignment.  The Department already has entire

21    borough dedicated to this purpose, our Risk

22    Management Bureau.  Risk Managements mandate and

23    purpose is to track the activities of officers and

24    any deficiencies and in performance of their duties

25    including all complaints made against them.
```

```
 1  COMMITTEE ON PUBLIC SAFETY                    63

 2  Together, with the Legal Bureau, Risk Management is

 3  tasked with identifying those officers whose

 4  performance has not been up to the high standards we

 5  expect, retraining these officers and as needed

 6  reassigning them.  Risk Managements work is above and

 7  beyond the existing structure overseen by me in my

 8  office.

 9      The Department will support this bill and ask

10  that the codification into law of the details of the

11  ever changing evolving system be removed.  Instead,

12  we publicly report the criteria we evaluate in the

13  context of such a system, so that this body and the

14  public are fully informed and can offer input.

15      We look forward to working with the sponsor on

16  the relatively small amendments that would make this

17  operationally feasible and valuable in achieving its

18  stated goal.

19      With respect to Proposed Intro. 721-A and

20  Preconsidered Intro. T-20206267, these bills would

21  affirm the right of citizens to record police

22  officers and require that an officers shield or rank

23  be visible.  The Department supports the substance of

24  both these bills which are in our Patrol Guide.

25
```

|   |   |   |
|---|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY | 64 |

2      No member of the NYPD should be interfering with
3   someone lawfully recording police conduct or
4   intentionally their shield number.  That is simply
5   unacceptable.  However, we have significant concerns
6   with the private rights of action included in both
7   bills.  Respectfully the Department cannot support
8   those provisions in either of these bills.  Portions
9   of these bills confirm what is already in law.  If an
10  officer impermissibly seizes property including a
11  recording of a law enforcement activity, an
12  individual has a cause of action.   NYPD officers
13  must also identify themselves and provide business
14  cards under the Right to Know law.  Creating
15  additional causes of civil action and mandatory
16  attorney's fees would only serve to incentivize all
17  avenues of a litigation to the detriment of the
18  already stressed budgets and staffing needs of the
19  NYPD to fight these suits.
20      Often, officers are faced with the challenge of
21  maintaining order at complicated crime scenes.  There
22  is often tension between the integrity of the assume
23  and the safety of the officers while allowing the
24  public to observe those officers' actions.  It could
25  be a difficult judgment for officers who are

| | |
|---|---|
| 1 | COMMITTEE ON PUBLIC SAFETY                    65 |
| 2 | involved.  We do not believe that incentivizing new |
| 3 | avenues to sue officers further reform or provide |
| 4 | justice to crime victims or their families. |
| 5 | Requiring officers to defend themselves in civil |
| 6 | suits even when they are able to mount a successful |
| 7 | defense opens the prospect of defense lawyers |
| 8 | impeaching an officers testimony in criminal |
| 9 | prosecutions every time that officer testifies. |
| 10 | Simply because officers have been named as defendants |
| 11 | in civil cases. |
| 12 |    So, I hope that members of the Council can see |
| 13 | that the NYPD has supported matters large and small |
| 14 | over the past six and a half years and we remain |
| 15 | willing partners in the overall effort to further |
| 16 | advance the Department's commitment to criminal |
| 17 | justice reform and serving all of the communities of |
| 18 | our city.  And as we do it is imperative that we move |
| 19 | forward together on a common ground to improve our |
| 20 | criminal justice system, the safety of all New |
| 21 | Yorkers and the safety of the police officers, every |
| 22 | police officer working daily to protect us. |
| 23 |    I thank you for the opportunity to speak about |
| 24 | these critical issues.  We look forward to answering |
| 25 | any questions you may have. |