<u>Committee on Public Safety</u>:
Daniel Ades, *Senior Legislative Counsel*
Joshua Kingsley*, Legislative Counsel*
Matthew Thompson, *Policy Analyst*
Nevin Singh, *Financial Analyst*



**THE COUNCIL OF THE CITY OF NEW YORK**

**<u>COMMITTEE REPORT OF THE
JUSTICE DIVISION</u>**
**Jeffrey Baker, Legislative Director**
**Brian Crow, Deputy Director, Justice Division**

**<u>COMMITTEE ON PUBLIC SAFETY</u>**
**Hon. Donovan Richards, Chair**

**June 9, 2020**

| | |
|---|---|
| **PROP. INT. NO. 536-A** | By Council Members Lancman, the Public Advocate (Mr. Williams), Cornegy, Rosenthal, Constantinides, Levin, Cumbo, Dromm, King, Koo, Reynoso, Chin, Barron, Adams, Rose, Menchaca, Ayala, Ampry-Samuel, Miller, Perkins, Rivera, Kallos, Levine, Torres, Van Bramer, Moya, Lander, Salamanca, Richards, Louis, Treyger, Koslowitz, Brannan, Powers, Gjonaj and the Speaker (Council Member Johnson) |
| **TITLE:** | A Local Law to amend the administrative code of the City of New York, in relation to chokeholds |

1

**ADMINISTRATIVE CODE:**     Adds section 10-182

**PROP. INT. NO. 721-A**     By the Public Advocate (Mr. Williams) and Council Members Rosenthal, Ampry-Samuel, Reynoso, Rivera, Kallos, Lander, Perkins, Menchaca, Lancman, Chin, Richards, Adams, Rose, Van Bramer, Constantinides and Cumbo

**TITLE:**     A Local Law to amend the administrative code of the City of New York, in relation to respecting the right to record police activities

**ADMINISTRATIVE CODE:**     Adds chapter 9 to title 10

**PROP INT. NO. 760-A**     By Council Members Gibson, Torres, the Public Advocate (Mr. Williams), Cumbo, Ampry-Samuel, Lander, Constantinides, Kallos, Van Bramer and Rosenthal

**TITLE:**     A Local Law to amend the administrative code of the City of New York, in relation to an early intervention system

**ADMINISTRATIVE CODE:**     Adds section 14-185

**PRECONSIDERED INT.**
**(RELATING TO SHIELDS)**     By Council Members Ampry-Samuel, The Public Advocate (Mr. Williams), Council Members Rivera, Cumbo, Levin, Chin, Kallos, Van Bramer and Rosenthal

**TITLE:**     A Local Law to amend the administrative code of the City of New York, in relation to requiring visible shield numbers and rank designations

**ADMINISTRATIVE CODE:**     Adds section 14-185

**PROP. RES. NO. 27-A**     By Council Members Cabrera, Koslowitz, Van Bramer, Constantinides and Chin

**TITLE:**     Resolution calling on the New York State legislature to pass and the Governor to sign A.6144 and S.6670A, legislation that would establish the crime of strangulation in the first degree; disregard of banned employment procedures.

| | |
|---|---|
| **PRECONSIDERED RES. (RELATING TO CHOKEHOLDS)** | By Council Members Rivera, Ampry-Samuel, Constantinides, Kallos, Van Bramer and Rosenthal |
| **TITLE:** | Resolution calling upon the United States Congress to pass, and the President to sign, the Eric Garner Excessive Use of Force Prevention Act of 2019 (H.R. 4408), which would prohibit police chokeholds and other tactics that result in asphyxiation. |

## I.     INTRODUCTION

On June 9, 2020, the Committee on Public Safety, chaired by Council Member Donovan Richards, will hold a hearing on Introduction Number 536-A ("Int. No. 536-A"), a local law to amend the administrative code of the City of New York, in relation to chokeholds; Prop. Int. No. 721-A, a local law to amend the administrative code of the City of New York, in relation to respecting the right to record police activities; Prop. Int. No. 760-A, a local law to amend the administrative code of the City of New York, in relation to an early intervention system; Preconsidered Int. (Relating to Shields), a local law to amend the administrative code of the City of New York, in relation to requiring visible shield numbers and rank designations; Proposed Resolution 27-A, calling on the New York State legislature to pass and the Governor to sign A.6144 and S.6670A, legislation that would establish the crime of strangulation in the first degree; disregard of banned employment procedures; and, Preconsidered Resolution (relating to chokeholds), calling upon the United States Congress to pass, and the President to sign, the Eric Garner Excessive Use of Force Prevention Act of 2019 (H.R. 4408), which would prohibit police chokeholds and other tactics that result in asphyxiation. Those expected to testify include representatives of the New York City Police Department ("NYPD"), advocates, and members of the public.

## II.     BACKGROUND

3

On July 17, 2014, Staten Island resident Eric Garner was killed after an interaction with NYPD Officer Daniel Pantaleo related to an arrest for selling untaxed cigarettes. During this interaction, Officer Pantaleo used what is commonly known as a "chokehold" on Mr. Garner, and a video of Pantaleo using this "chokehold" filmed by a bystander, while Mr. Garner repeatedly stated "I can't breathe," was widely distributed in mainstream and social media.[1] A Staten Island Grand Jury declined to indict officer Pantaleo for any criminal charges.[2] Over five years after Mr. Garner's death, Officer Pantaleo was fired by the New York Police Department.[3]

On May 25 2020, in Minneapolis, Minnesota, George Floyd was killed by Minneapolis police officers who knelt on his back and neck while he was face down on the ground for over 8 minutes while he repeatedly told them he could not breathe.[4] The officers, who were arresting Mr. Floyd in relation to a counterfeit $20 bill[5], were fired the day after the incident.[6] One of the four officers stands charged with second degree murder, and the other three are charged with aiding in Mr. Floyd's death.[7]

These incidents, as well as many others, and a history of tension between police departments and communities of color have prompted widespread protests across the country and

---

[1] E.g., Mark Morales, David Shortell and Holly Yan, "Chants of 'I can't breathe!' erupt as the officer in the Eric Garner case won't face federal charges," CNN, July 19, 2019, available at
https://www.cnn.com/2019/07/17/us/eric-garner-no-federal-charges-against-officer-reaction/index.html
[2] "Grand Jury Declines to Indict NYPD Officer in Eric Garner Chokehold Death," NBC,  December 3, 2014, *available at:* https://www.nbcnewyork.com/news/local/grand-jury-decision-eric-garner-staten-island-chokehold-death-nypd/1427980/
[3] "Daniel Pantaleo, Officer Who Held Eric Garner in Chokehold, Is Fired," NYTimes, August 19, 2019, *available at:* https://www.nytimes.com/2019/08/19/nyregion/daniel-pantaleo-fired.html
[4] "8 Minutes and 46 Seconds: How George Floyd Was Killed in Police Custody," NYTimes, May 31, 2020, *available at:* https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html
[5] "What Happened in the Chaotic Moments Before Heorge Floyd Died," NYTimes, May 29, 2020, *available at:* https://www.nytimes.com/2020/05/29/us/derek-chauvin-george-floyd-worked-together.html
[6] "'I Can't Breathe': 4 Minneapolis Officers Fired After Black Man Dies in Custody", NYTimes, May 26, 2020, *available at:* https://www.nytimes.com/2020/05/26/us/minneapolis-police-man-died.html
[7] "New Charges for Former Minneapolis Police Officers as Protests Persist," NYTimes, June 3, 2020, *available at:* https://www.nytimes.com/2020/06/03/us/george-floyd-officers-charged.html

in New York City.[8] Some media outlets and advocates have reported that during these protests, officers have been covering their badges in violation of NYPD policy.[9]

    The NYPD's Patrol Guide prohibits the use of chokeholds and other tactics that risk impeding respiration of an individual subject to arrest or detention.  Patrol Guide section 221-01 broadly outlines NYPD policies regarding Use of Force, which explicitly prohibits officers from using chokeholds, defined as "any pressure to the throat or windpipe, which may prevent or hinder breathing or reduce intake of air."[10]  Additionally, Patrol Guide §221-02 (11.a) advises officers to "[a]pply no more than the reasonable force necessary to gain control," and "[a]void actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back, thereby reducing the subject's ability to breathe."[11]During the recent protests, and repeatedly in the past, there have been reports of NYPD officers restricting bystander from filing police-involved activities, including numerous lawsuits based on NYPD attempts to suppress such filming.[12] The federal constitution protects the right to film police activities generally,[13] and the NYPD has issued a message to its officers generally guiding them not to prevent such filming with

---

[8] "Why the Killing of George Floyd Sparked an American Uprising, " Time, June 4, 2020, *available at:* https://time.com/5847967/george-floyd-protests-trump/

[9] "NYPD cops accused by advocacy groups of covering shield numbers during George Floyd protests" Daily News, June 4, 2020, *available at:* https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-cops-accused-covering-shield-numbers-protests-20200604-rje2krqecfcrdcex2p2fdy3c5i-story.html

[10] NYPD Patrol Guide §221-01; available at:
https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/public-pguide3.pdf.

[11] NYPD Patrol Guide §221-02 (11.a); available at:
https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/public-pguide3.pdf.

[12] E.g., Noah Goldberg, "Defense attorney claims she was wrongfully arrested by Brooklyn cops for recording them frisking suspects," The New York Daily News, May 11, 2020, available at
https://www.nydailynews.com/coronavirus/ny-coronavirus-legal-aid-attorney-arrest-nypd-record-iphone-dog-20200511-fekxblcgjje3jiglumisjay3sm-story.html

[13] Gericke v. Begin, 753 F.3d 1, 9 (1st Cir. 2014); see also Am. Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (7th Cir. 2012); Adkins v. Limtiaco, 537 F. App'x 721, 722 (9th Cir. 2013)
Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011); John J. Ryan, Constitutional Law - First Circuit Court of Appeals Upholds A Citizen's Right to Film A Police Officer During A Traffic Stop Absent A Reasonable Restriction - Gericke v. Begin, 753 F.3d 1 (1st Cir. 2014)., 20 Suffolk J. Trial & App. Advoc. 155 (2015)

certain exceptions.[14] Civilians in New York may only be arrested for recording police encounters when their activity amounts to obstruction or interference with a police officer's duties. Pursuant to the New York State Penal Law, if a person obstructs or interferes with a police officer's duties they can be arrested and charged with "obstructing governmental administration"[15] or "disorderly conduct".[16]

Notwithstanding the NYPD's directive and case law, according to the New York City Civilian Complaint Review Board (CCRB) officers have been found to interfere with such recordings. According to the CCRB report "*Worth a Thousand Words: Examining Officer Interference with Civilian Recordings of Police,[17]*" published in June 2017, from January 1, 2014 through December 31, 2016 the CCRB closed 257 complaints, covering 346 allegations, in which civilians reported that officers interfered with their ability to record.[18] Police interference included but was not limited to officers instructing civilians to stop recording, searching civilians' phones for recordings of activity, deleting such footage, and damaging recording devices.[19] In 58% of these complaints, civilians were recording their own interaction with police officers, and the remaining 42% were bystanders recording or attempting to record an encounter with a third party.[20]Several of the officers involved in high profile incidents that have been viewed as examples of misconduct appear to have been the subject of prior disciplinary action[21] or civil litigation

---

[14] Information provided to the Council by the NYPD.
[15] *See* Penal Law 195.05
[16] *See* Penal Law 240.20
[17] Available at http://www1.nyc.gov/assets/ccrb/downloads/pdf/20172806_report_recordinginterference.pdf
[18] "Worth a Thousand Words: Examining Office Interference with Civilian Recordings of Police" The Civilian Complaint Review Board June 2017 *available at*
http://www1.nyc.gov/assets/ccrb/downloads/pdf/20172806_report_recordinginterference.pdf
[19] *Id.* at 1
[20] *Id.* at 1
[21] "Records Leak in Eric Garner Case Renews Debate on Police Discipline," NYTimes, March 22, 2017, *available at:* https://www.nytimes.com/2017/03/22/nyregion/nypd-eric-garner-daniel-pantaleo-disciplinary-records.html

alleging misconduct.[22] In addition, the use of force by police officers has been increasing even as crime has decreased.[23] In 2015, the NYPD created a Force Investigations Division, which is designed to centralize and standardize the way the NYPD investigates whether a use of force was appropriate.[24]

However, it is unclear whether the results of those investigations, as well as allegations included in lawsuits against officers, CCRB complaints and investigations, judicial determinations on the lawfulness of arrests and adverse credibility findings are assessed in a centralized fashion in order to monitor, retrain, or reassign individual officers who have been found to have used excessive force or engaged in the alleged misconduct.

## III.   ANALYSIS OF PROP. INT. NO. 536-A

Section 1 of the bill makes it a misdemeanor to restrain an individual in a manner that restricts the flow of air or blood by compressing the windpipe, diaphragm, or the carotid arteries on each side of the neck in the course of effecting or attempting to effect an arrest.

Section 2 of the bill would have it take effect immediately.

## IV.   AMENDMENTS TO PROP. INT. NO. 536-A

---

[22] "NYC Cop who tased and punched a man in viral video named in 7 lawsuits settled by NYC for $210K", Daily News, May 4, 2020, *available at:* https://www.nydailynews.com/new-york/nyc-crime/ny-punch-20200504-pxs6vb5czzbozlggiansyu5mzm-story.html

[23] "Cops used more force in 2019, even as arrests fell last year: report", Daily News, March 11, 2020, *available at:* https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-use-of-force-report-20200311-2vwo4wq5mfg3dkcm2bgi6dr4ai-story.html

[24] Inside the Unit that Studies Use of Police Force," NY1, January 30, 2019, *available at:* https://www.ny1.com/nyc/all-boroughs/news/2019/01/30/inside-the-new-nypd-unit-that-studies-use-of-police-force-

This bill has been amended since it was introduced. The original version prohibited chokeholds, defined as wrapping an arm around or gripping the neck in a manner that limits or cuts off either the flow of air by compressing the windpipe, or the flow of blood through the carotid arteries on each side of the neck.

## V.     <u>ANALYSIS OF PROP. INT. NO. 721-A</u>

Section 1 of the bill creates an affirmative right of an individual to record police activities and maintain custody and control of any such recording. It further establishes a private right of action in any court of competent jurisdiction when an individual demonstrates that he or she recorded to attempted to record police activities and an officer interfered with that person's recording by, for example, preventing or attempting to prevent the recording of police activities, threatening or making any effort to intimidate a person recording police activities, stopping, seizing, searching, using any summons, or arresting any individual because such individual recorded police activities or seizing property or instruments used by any individual to record police activities.

The bill establishes an affirmative defense that a reasonable officer would have probable cause to believe that the person recording police activities physically interfered with an official and lawful police function or that the officer's actions were otherwise authorized by law.

In addition, the bill requires the commissioner to submit a quarterly report of the number of arrests and summonses in which the person arrested or summonsed was recording police activities, disaggregated by the patrol precinct, the offense charge, and the race, ethnicity and gender of the person arrested or summonsed.

Section 2 of the bill states that a finding that portions of the law were invalid would not invalidate the other portions of the law.

Section 3 would have the bill take effect 30 days after it becomes law, except that the first report would be due within 20 days of January 1, 2021.

## VI.  **AMENDMENTS TO PROP. INT. NO. 721-A**

This bill has been amended since it was introduced. The original version indicated that a court may allow a prevailing plaintiff reasonable attorney's fees as part of the costs, whereas the current version states that the court shall allow such fees.

## VII.  **ANALYSIS OF PROP. INT. NO. 760-A**

An early intervention system (EIS) is a management tool for law enforcement that utilizes data to help identify troubling patterns in policing and officers that are experiencing issues with performance.  EIS, also known as early warning systems, are notable for their ability to identify officers before their behavior requires formal discipline and to illustrate the areas in which a department could improve its practices.  Use of an EIS typically involves four steps: 1) collection and review of officer performance indicators; 2) identification of officers whose performance raises concerns; 3) intervention with identified officers; and 4) ongoing monitoring of such officers to ensure improvement.

Similar to NYPD's renowned CompStat program, EIS rely on the analysis of regularly updated data.  The data utilized in an EIS will primarily consist of officer performance indicators. There is no set number of metrics that must be used—some contain as few as five, while others have more than 25 indicators.  For example, a model utilized during the early 2000s by the United

States Department of Justice (DOJ) included 16 metrics, including those related to use of force, complaints and compliments, stops made, arrests made and citations issued, training and evaluation history, and personal leave used.  While there is no recommended minimum number, a broader range of indicators will help to mitigate the impact of possibly flawed data and provide supervisors with a more comprehensive view of an officer's work.

EIS are valuable both to individual officers and departments on the whole. Effective EIS use not only allows a department to tailor its training and policies to help its officers avoid incidents that cause complaints, but also to "save" the careers of officers by identifying problems early in their careers.  Individual officers can also benefit through easier identification of those with excellent records.  An EIS is most effective when it is utilized not to punish officers, but to identify and help those in need before major issues arise.

Further, identifying officers with performance issues can improve the reputation of the department as a whole. Research shows that a small subset of officers is often responsible for a disproportionate number of complaints and misconduct incidents.  This is true both generally and in New York City. CCRB found that just 10 percent of officers were responsible for 78 percent of misconduct claims.  Utilization of an EIS helps a department target its resources where most needed, leading to an overall decline in misconduct.  Indeed, following the implementation of an EIS by the LASD, officer shootings, use of force, and civilian complaints declined while officer performance improved.  Departments can also save time and money through reduced complaints and lawsuits if they are successful in identifying patterns and conducting interventions, as well as improve their relations with the community.

Since their development in the 1980s, officer performance monitoring systems have been linked to improving police accountability.  Establishment and regular use of an EIS is one of the

10

three principal reforms required by the DOJ in consent decrees or memoranda of agreement reached with police departments accused of systemically depriving individuals of civil rights. Cities that have implemented EIS as part of DOJ oversight see a decrease in complaints and create a better climate of accountability.  Some have suggested that use of an EIS could result in a "chill" in enforcement as officers become more hesitant to perform their duties; however, a number of cities that created EIS under federal oversight saw crime rates decline and in some cases, an increase in arrests.

The proposed legislation would require the creation of an EIS. Section 1 of the bill requires the department to maintain a centralized system that is used to record, track, review, and evaluate officer activity and to identify officers that may be in need of enhanced training monitoring, or reassignment based on: information reported by corporation counsel based on civil actions regarding the police department, complaints received and results of investigations conducted by the civilian complaint review board ("CCRB") and the police department, complaints received by the department of investigation, use of force incidents and incidents of excessive force, arrests and summonses for disorderly conduct, obstructing governmental administration, and resisting arrest, judicial or departmental determinations that detentions of individuals were not legally justified, criminal arrests of investigations of an officer known to the department, judicial determinations that an officer's testimony is not credible, vehicle pursuits and collisions involving department equipment, violations of the department's patrol guide, disciplinary actions and ongoing disciplinary proceedings, non-disciplinary corrective actions, awards and commendations, and training records.

The bill further requires the department to post on its website and submit to the mayor and speaker of the council a report on the department's use of the early intervention system.

Section 2 of the bill would have it take effect on September 1, 2020

## VIII.   AMENDMENTS TO PROP. INT. NO. 760-A

This bill has been amended since it was introduced.

The original version required an early intervention system to be maintained by a department or office designated by the mayor that would allow for electronic information sharing by the department with the law department, the comptroller, the CCRB, and the individual responsible for implementing the system.

The original version required the department to provide the law department, the comptroller, the CCRB, and the NYPD Inspector General with information related to pending or resolved civil actions or claims filed against individual police officers, including precinct affiliation, rank, and employment date, on a bi-weekly basis. The bill further required the department to notify, upon request, the law department, the comptroller, the CCRB, and the NYPD-IG as to whether the subject officer of a given claim was on duty or wearing a department uniform at the time of the incident. The bill further exempted any information considered confidential pursuant to Civil Rights Law §50-a.

The original  version also required the department to share with the department that would maintain the early intervention system the following information regarding civil actions filed in state or federal court regarding allegations of improper police conduct including claims involving the use of force, assault and battery, malicious prosecution, or false arrest or imprisonment: the court in which the action was filed; the name of the law firm representing the plaintiff; the name of the law firm or agency representing each defendant; the date the action was filed; the allegation of improper police conduct; and if an action has been resolved, the date it was resolved, the manner

in which it was resolved, and whether the resolution included a payment to the plaintiff by the city and the amount of such payment.

Section 3 of this bill would have had it take effect on January 1, 2019.

## IX.    ANALYSIS OF PRECONSIDERED INT. (RELATED TO SHIELDS)

Section 1 of the bill requires an officer's shield number or rank designation to be visible at all times while such officer is in uniform and performing any activity under the color of law. The bill further establishes a claim for refusal to make a shield number or rank designation visible when an individual demonstrates that they requested that an officer make their shield number or rank designation visible and the officer did not comply. The bill further creates a right of action in any court of competent jurisdiction for an individual subject to a refusal to make a shield number or rank designation visible, and requires a court to award a prevailing plaintiff reasonable attorney's fees and court costs.

Section 2 of the bill would have it take effect immediately.

Proposed Int. No. 536-A

By Council Members Lancman, the Public Advocate (Mr. Williams), Cornegy, Rosenthal, Constantinides, Levin, Cumbo, Dromm, King, Koo, Reynoso, Chin, Barron, Adams, Rose, Menchaca, Ayala, Ampry-Samuel, Miller, Perkins, Rivera, Kallos, Levine, Torres, Van Bramer, Moya, Lander, Salamanca and Richards

A Local Law to amend the administrative code of the City of New York, in relation to chokeholds and other such restraints

Be it enacted by the Council as follows:

Section 1.  The administrative code of the city of New York is amended by adding a new section 10-182 to read as follows:

§ 10-182 Unlawful methods of restraint.

a.  Unlawful methods of restraint. No person shall restrain an individual in a manner that restricts the flow of air or blood by compressing the windpipe, diaphragm, or the carotid arteries on each side of the neck in the course of effecting or attempting to effect an arrest.

b. Penalties. Any person who violates subdivision a of this section shall be guilty of a misdemeanor punishable by imprisonment of not more than one year and a fine of not more than two thousand five hundred dollars, or both.

c. Any penalties resulting from a violation of subdivision a of this section shall not limit or preclude any cause of action available to any person or entity injured or aggrieved by such violation.

§ 2.  This local law takes effect immediately.

LS # 2203/LS 2271/LS 2680/Int. 540-2014
LS 181
CJG/BG/RC/BC
6/1/20

Proposed Int. No. 721-A

By the Public Advocate (Mr. Williams) and Council Members Rosenthal, Ampry-Samuel, Reynoso, Rivera, Kallos, Lander, Perkins, Menchaca, Lancman, Chin, Richards, Adams, Rose and Van Bramer

A Local Law to amend the administrative code of the city of New York, in relation to respecting the right to record police activities

Be it enacted by the Council as follows:

Section 1. Title 10 of the administrative code of the city of New York is amended by adding a new Chapter 9 to read as follows:

Chapter 9

The Right To Record Police Activities

§ 10-901 Definitions.

§ 10-902 Right to record police activities.

§ 10-903 Private right of action.

§ 10-904 Preservation of rights.

§ 10-905 Reporting.

§ 10-901 Definitions. For purposes of this chapter, the following terms have the following meanings:

Officer. The term "officer" means any peace officer or police officer as defined in the criminal procedure law who is employed by the city of New York, or any special patrolman appointed by the police commissioner pursuant to section 14-106 of the administrative code.

Police activities. The term "police activities" means any activity by an officer acting under the color of law.

Record. The term "record" means to capture or attempt to capture any moving or still image, sound, or impression through the use of any recording device, camera, or any other device capable of capturing audio, moving or still images, or by way of written notes or observations.

§ 10-902 Right to record police activities. A person may record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording. Nothing in this chapter shall be construed to permit a person to engage in actions that physically interfere with an official and lawful police function, or to prevent the seizure of any property or instruments used in a recording of police activities where the seizure is otherwise authorized by law, or to prohibit any officer from enforcing any other provision of law.

§ 10-903 Private Right of Action. a. A claim of unlawful interference with recording police activities is established under this chapter when an individual demonstrates that he or she recorded or attempted to record police activities in accordance with section 10-902 and an officer interfered with that person's recording of police activities. Such interference includes but is not limited to the following actions:

1. preventing or attempting to prevent the recording of police activities;

2. threatening or making any effort to intimidate a person recording police activities;

3. stopping, seizing, searching, issuing any summons, or arresting any individual because such individual recorded police activities; or

4. seizing property or instruments used by any individual to record police activities.

b. It shall be an affirmative defense that a reasonable officer in the position of such officer would have had probable cause to believe that the person recording police activities physically interfered with an official and lawful police function, or that such officer's actions were otherwise authorized by law.

c. A person subject to unlawful interference with recording police activities as described in subdivision a of this section may bring an action in any court of competent jurisdiction for any damages, including punitive damages, and for declaratory and injunctive relief and such other remedies as may be appropriate.

d. In any action or proceeding to enforce this section, the court shall allow a prevailing plaintiff reasonable attorney's fees as part of the costs, and may include expert fees as part of the attorney's fees.

e. Any action or proceeding to enforce this section shall be commenced no later than one year and 90 days after the date on which the violation of this section is committed.

§ 10-904 Preservation of rights. This section shall be in addition to all rights, procedures, and remedies available under the United States Constitution, Section 1983 of Title 42 of the United States Code, the Constitution of the State of New York and all other federal law, state law, law of the City of New York or the New York City Administrative Code, and all pre-existing civil remedies, including monetary damages, created by statute, ordinance, regulation or common law.

§ 10-905 Reporting. The commissioner shall submit to the council and the mayor, and post to the department's website, within 20 days of the beginning of each quarter, a report containing the following information for the previous quarter: the number of arrests, criminal summonses, and civil summonses in which the person arrested or summonsed was recording police activities as defined in section 10-901. Such report shall include this information in total and disaggregated by the following factors: the patrol precinct in which such arrest or summons occurred, the offense charged, and the apparent race, ethnicity, gender, and age of the person arrested or summonsed. The information to be reported pursuant to this section shall be compared to previous reporting periods, shall be permanently stored on the department's website, and shall be stored in

alphanumeric form that can be digitally transmitted or processed and not in portable document format or scanned copies of original documents.

§ 2. Severability. If any provision of this bill or any other provision of this local law, or any amendments thereto, shall be held invalid or ineffective in whole or in part or inapplicable to any person or situation, such holding shall not affect, impair or invalidate any portion of or the remainder of this local law, and all other provisions thereof shall nevertheless be separately and fully effective and the application of any such provision to other persons or situations shall not be affected.

§ 3. This local law takes effect 30 days after it becomes law, provided that the first quarterly report pursuant to section 10-905 is due within 20 days of the quarter beginning January 1, 2021.

LS 2383.1/Int. 1235-2016
LS # 385
BC
6/3/20 11:36PM

Proposed Int. No. 760-A

By Council Members Gibson, Torres, the Public Advocate (Mr. Williams), Cumbo and Ampry-Samuel

A Local Law to amend the administrative code of the city of New York, in relation to an early intervention system

Be it enacted by the Council as follows:

Section 1. Section 1. Chapter 1 of title 14 of the administrative code of the city of New York is amended to add a new section 14-185 to read as follows:

§ 14-185 Early intervention system. a. The department shall maintain a centralized system that is used to record, track, review, and evaluate officer activity and to identify officers that may be in need of enhanced training, monitoring, or reassignment. Such system shall collect and utilize, at a minimum, the following:

(i) information reported pursuant to section 7-114;

(ii) complaints received and results of investigations conducted by the civilian complaint review board;

(iii) complaints received and investigations conducted by the police department, including but not limited to investigations conducted by the internal affairs bureau, and any disposition resulting from any such investigation;

(iv) complaints received pursuant to section 804 of the charter;

(v) use of force incidents and incidents of excessive force, as those terms are defined in section 14-158;

(vi) arrests and summonses for violations of sections 240.20, 195.05, and 205.30;

(vii) judicial or departmental determinations that detentions of individuals were not legally justified;

(viii) criminal arrests or investigations of an officer known to the department;

21

(ix) judicial determinations that an officer's testimony is not credible;

(x) vehicle pursuits and collisions involving department equipment;

(xi) violations of the department's patrol guide;

(xii) disciplinary actions and ongoing disciplinary proceedings;

(xiii) non-disciplinary corrective actions;

(xiv) awards and commendations; and

(xv) training records.

b. By January 31 in each year, the department shall post on its website and submit a report to the mayor and the speaker of the council a report on the department's use of the early intervention system during the previous year, including, but not limited to (i) any additional information, other than the information required by subdivision a of this section, that is collected and utilized through such system; (ii) the process for identifying, through such system, officers that may be in need of enhanced training or monitoring; (iii) the interventions utilized by the department with identified officers; and (iv) procedures and systems for ongoing monitoring of such officers to ensure improvement.

§ 2. This local law takes effect on September 1, 2020.

LS 3591, 3592, 4917/Int. 927-2015
LS 5637
6/3/20 11:56PM

Preconsidered Int. No.

By Council Members Ampry-Samuel, the Public Advocate (Mr. Williams), Rivera, Cumbo and Levin

A Local Law to amend the administrative code of the city of New York, in relation to requiring visible shield numbers and rank designations

Be it enacted by the Council as follows:

1    Section 1. Chapter 1 of title 14 of the administrative code of the city of New York is

2    amended to add a new section 14-185 to read as follows:

3    § 14-185 Shield numbers and rank designations. a. An officer's shield number or rank

4    designation shall be visible at all times while such officer is in uniform and performing any activity

5    under the color of law.

6    b. 1. A claim of refusal to make a shield number or rank designation visible is established

7    under this section when an individual demonstrates that they requested that an officer make their

8    shield number or rank designation visible pursuant to subdivision a of this section and such officer

9    did not comply.

10    2. An individual subject to refusal to make a shield number or rank designation visible as

11    described in paragraph 1 of subdivision b of this section may bring an action in any court of

12    competent jurisdiction for any damages, including punitive damages, and for declaratory and

13    injunctive relief and such other remedies as may be appropriate.

14    3. In any action or proceeding to enforce this section, the court shall award a prevailing

15    plaintiff reasonable attorney's fees and court costs, and may include expert fees as part of the

16    attorney's fees.

17    4. Any action or proceeding to enforce this section shall be commenced no later than one

18    year and 90 days after the date on which the violation of this section is committed.

23

1          <u>c. This section does not limit or abrogate any claim or cause of action a person has under</u>

2    <u>common law or by other law or rule. The provisions of this section are in addition to any other</u>

3    <u>remedies that may be provided for under common law or by other law or rule.</u>

4          § 2.  This local law takes effect immediately.

LS 15282
6/4/20 12:21AM

Res. No. 27

Resolution calling upon the New York State Legislature to pass and the Governor to sign A.1699 and S.4915, legislation that would establish the crime of strangulation in the first degree; disregard of banned employment procedures.

By Council Members Cabrera, Koslowitz and Van Bramer

Whereas, On Thursday, July 17, 2014, Eric Garner, who was unarmed and accused of selling loose cigarettes, was placed in a chokehold in Staten Island by a New York Police Department ("NYPD") officer; and

Whereas, Despite Mr. Garner's pleas that he could not breathe, the officers proceeded to put him in handcuffs and he died later in the hospital; and

Whereas, The NYPD Patrol Guide bans the use of chokeholds which includes, but is not limited to, any pressure to the throat or windpipe which may prevent or hinder breathing to reduce intake of air; and

Whereas, Currently, New York Penal Law section 121.11 makes it a class A misdemeanor for a person to apply pressure on the throat or neck of a person with intent to impede the normal breathing or circulation of the blood of such person, and such action rises to the level of a class C violent felony if it results in serious physical injury; and

Whereas, A.1699 /S.4915 sponsored by Assembly Member Walter Mosley and Senator Ruben Diaz and pending in the New York State Assembly and Senate, respectively, will establish the crime of strangulation in the first degree; disregard of banned employment procedures; and

Whereas, A.1699 /S.4915 provide that a person is guilty of strangulation in the first degree; disregard of banned employment procedures when he or she disregards any procedures banned by his or her employment and commits the crime of criminal obstruction of breathing or blood

circulation, as defined section 121.11 of the penal law, causing serious physical injury or death to another person; and

      Whereas, A.1699 /S.4915 makes such offense a class B felony and;
      Whereas, A.1699 /S.4915 also criminalizes the use of a chokehold procedure in any

context as a class A misdemeanor; now, therefore, be it

      Resolved, That the Council of the City of New York calls upon the New York State Legislature to pass and the Governor to sign A.1699 and S.4915, legislation that would establish the crime of strangulation in the first degree; disregard of banned employment procedures.

LS# 1595
RCC/WJH
1/11/18

26

Preconsidered Res. No.

Resolution calling upon the United States Congress to pass, and the President to sign, the Eric Garner Excessive Use of Force Prevention Act of 2019 (H.R. 4408), which would prohibit police chokeholds and other tactics that result in asphyxiation.

By Council Members Rivera and Ampry-Samuel

Whereas, On July 17, 2014, Eric Garner, an unarmed Black man, died after being choked by a New York City ("NYC" or "City") Police Department ("NYPD" or "Department") officer as a witness filmed him crying out "I can't breathe" 11 times; and

Whereas, The death of Eric Garner launched protests across the City and the United States (U.S.); and

Whereas, These protests energized the #BlackLivesMatter movement, which grew rapidly after the fatal police shooting of Michael Brown, an unarmed Black teenager in Ferguson, Missouri; and

Whereas, Driven by those events and the deaths of numerous other Black men and women in police custody, this movement elevated a national discussion on police use of force and other law enforcement tactics that disproportionately impact  communities of color; and

Whereas, Nearly six years later, on May 25, 2020, George Floyd, an unarmed Black man, died in the custody of Minneapolis police as witnesses filmed him repeatedly crying out "I can't breathe" while an officer kneeled on his neck for eight minutes and 46 seconds; and

Whereas, This incident and other recent high profile cases of police killings of unarmed Black civilians has sparked days of protests in the City and across the country; and

Whereas, These protests have largely demanded, in part, accountability for officers such as those involved in the death of George Floyd, one of whom has been arrested and is being prosecuted by a local District Attorney; and

Whereas, However, historically local District Attorneys have failed to successfully prosecute and hold accountable officers involved in the killings of unarmed Black civilians, including the officer who choked Eric Garner; and

Whereas, Federal prosecutors have fewer ties to local law enforcement entities and should be given the power to use their greater independence to investigate, prosecute, and hold accountable police officers who kill unarmed civilians; and

Whereas, The Eric Garner Excessive Use of Force Prevention Act of 2019 (H.R. 4408), sponsored by U.S. Representative Hakeem Jeffries, would amend section 242 of title 18, U..S. Code, to forbid the use of chokeholds as a civil rights violation; and

Whereas, This law would enable federal authorities to hold accountable police officers involved in the killing of George Floyd and similar tragic incidents; and

Resolved, That the Council of the City of New York calls upon the upon the United States Congress to pass, and the President to sign, the Eric Garner Excessive Use of Force Prevention Act of 2019 (H.R. 4408), which would prohibit police chokeholds and other tactics that result in asphyxiation.

LS #15250
6/1/2020
CGR