# Exhibit 2

**CRIMINAL COURT OF THE CITY OF NEW YORK**
**COUNTY OF KINGS: PART AP3**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>- against -<br><br>SEAN PAUL REYES,<br><br>Defendant. | **AFFIRMATION IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND INSPECT**<br><br>**DOCKET NO. CR-019322-22KN** |

JAMES HAMILTON, an attorney licensed to practice law in this State and an Assistant District Attorney in the County of Kings, affirms the following to be true under the penalties of perjury:

1.      I am an Assistant District Attorney in the Kings County District Attorney's Office and as such I am familiar with the facts of the above-captioned case based upon the records and files maintained by the Kings County District Attorney's Office.

2.      I make this affirmation upon information and belief based on my review of the files of the Kings County District Attorney's Office and the files of the Court pertaining to this case.

## FACTS OF THE CASE

3.      On June 1, 2023, the defendant along with another individual went to the 75th Precinct in Brooklyn, NY. The defendant and his associate had video recording equipment.

4.      The defendant was carrying a cellphone which was secured on handheld device known as a "gimbel."

5.      The defendant's companion was holding a camera on another handheld device. The defendant's companion's camera also had what appeared to be a microphone attached.

6.      At approximately 11:15 AM the defendant entered the lobby of the 75th Precinct. The defendant was informed by the first officer that the defendant encountered that he "could not film in here".

7.      The defendant remained in the lobby and continued to record.

8.      Additional officers entered the area where the defendant was, the first thing these officers stated to the defendant was "you cannot record in here." The defendant continued to record.

9.      Officers then asked the defendant to step out of the Precinct. The defendant refused and continued to record.

10.     Officers then escorted the defendant out of the precinct and informed him that he is not permitted to record in the lobby.

11.     Officers then informed defendant if he re-entered the Precinct, he would be arrested.

12.     The Officers re-entered the Precinct and closed the doors.

13.     The defendant then entered the precinct again. The defendant was still recording using his phone and gimble device.

14.     The defendant was placed under arrest at approximately 11:12am.

15.     The entire occurrence was recorded by the defendant, with additional footage captured by the defendant's companion who remained outside the 75th Precinct. The defendant posted the footage and audio recorded by the defendant and his companion to YouTube through the defendant's YouTube channel "Long Island Audit". (See Exhibit A)

16.     The defendant titled the video "NYPD Thugs Go HANDS ON Fast! Arrest Journalist For Recording! Federal Lawsuit Incoming! (See Exhibit B)

17.     The     footage     posted     online     can     be     found     at     this     link: https://www.youtube.com/watch?v=DoYDeBXlUKM

18.     Defendant is a social media influencer that records videos confronting police officers in various jurisdictions and displays them under his profiles (Long Island Audit) on YouTube and Tik Tok among other social media networks. The videos that are posted on these various social media websites feature the defendant confronting police officers about recording in precincts and generate significant views and subscriptions. Social media sites such as YouTube and Tik Tok generate income for users that share their content on their network. The amount of money generated is directly related to the number of interactions, responses and views each video generates. This powerful incentive to create content has netted the defendant significant monetary proceeds. By the defendant's own account his monthly income is $50,000 (per the defendant's CJA). His website also features merchandise and branding associated with his video persona and features a Gofundme where donations are made to support the legal costs associated with producing these videos. (See Exhibit A and Exhibit B)

19.     The defendant was arraigned on June 1st, 2023, in Criminal Court.

20.     On June 5th, 2023, The People served and filed statement notice.

21.     On June 30th the People served and filed initial discovery inventory and an initial discovery NDF. The People also turned over initial discovery on that date.

22.     On July 24th, 2023, this case was on in AP3. The People were not ready on that date, the case was adjourned to September 20th, 2023.

23.     On August 10th, 2023, The People served and filed a Certificate of Compliance along with a Statement of Readiness.

24.     On September 19th, 2023, Defense served and filed a motion to dismiss.

25.     On September 20th, 2023, this case was on in AP3. The People announced ready on that date. The case was adjourned till November 21st for motion practice.

## PROCEDURAL POSTURE

26.     Counsel moves this court by motion dated September 19, 2023, for an order dismissing the complaint in this action under CPL §§ 170.30(1)(a),(e),(f), and (g). Finally, counsel requests access to the Precinct to preserve photographs from inside the precinct pursuant to CPL § 245.30(2). Counsel alleges in his moving papers that the information should be dismissed because 1) the criminal complaint is defective within the meaning of CPL § 170.35(1)(a) and CPL § 100.30; 2) that the NYPD trespass policy is unlawful; 3) that there is a legal impediment to conviction of the defendant pursuant to CPL § 170.30(1)(f); 4) that dismissal is required in the furtherance of justice or 5) that the people have failed to announce ready in the statutorily required time period set forth in CPL § 30.30.

27.     Counsel's reasoning for the above listed dismissals hinge on four main arguments: 1) the defendant's activities are Constitutionally protected behavior that cannot be criminally proscribed; 2) the defendant's activities are permitted because of the NYS Right to Monitor and the NYC Right to Record Act; 3) the trespass counts are duplicitous; and 4) the People failed to state the necessary facts to satisfy the elements of the crimes charged in their complaint.

28.     For the reasons stated herein, the motions to dismiss should be denied. The information alleges non-hearsay facts that satisfy all of the charged crimes within the requirements of CPL §§ 100.40, 170.35, and 170.30(1)(a). Having satisfied the requirements of CPL § 100.40, there is no reason to invalidate the People's CPL § 30.30(5-a) statement. NYPD's actions in arresting the defendant for his conduct on June 1, 2023, were not proscribed by the US Constitution or the NYS or NYC Right to Record statutes, and the interests of justice are not served by allowing the defendant to engage in the activity for which he is charged herein.

## I.   THE INFORMATION IN THIS CASE IS FACIALLY SUFFICIENT AND NOT DUPLICITOUS

29.     The Information in this case is facially sufficient. A facially sufficient complaint lays out facts that establish all elements of the alleged crime. The complaint in this case alleges that the defendant committed the crimes of Trespass and Obstructing Governmental Administration ("OGA"). This complaint states that the defendant was ordered by a Police Officer to leave a precinct and that the defendant refused to comply with that order. The complaint further states the defendant re-entered the premises after being ordered out. The facts alleged in the complaint clearly establish all the elements of both trespass and OGA.

30.     The purpose of a facial sufficiency motion is to dismiss complaints which are so vague or so lacking in facts that the defense has no ability to prepare a defense and there is a risk that the defendant could be tried for the same offense twice.[1] There is absolutely no risk of that with this accusatory instrument. The complaint makes it clear that defendant is being charged with trespassing at a specific precinct at a specific time. Given the specificity of the complaint, there is no chance that the defendant could be tried for this offense again because of an insufficient complaint.

31.     Additionally, the content of the defendant's motion makes it clear that they are sufficiently on notice and able to prepare a defense against these accusations. The defendant included a complicated and well-researched defense in its motion. If the complaint lacked specific elements or was so vague that the defense was not on notice of what they were accused of, that

---

[1] "So long as the factual allegations of an information give an accused notice sufficient to prepare a defense and are adequately detailed to prevent a defendant from being tried twice for the same offense, they should be given a fair and not overly restrictive or technical reading." *People v Casey*, 95 NY2d 354, 360 (2000).

would have been an impossible task. On page 10 of their motion, the defense specifically states that the **ISSUE** in this case is whether the order requiring Mr. Reyes to abstain from filming was lawful. This line demonstrates that the accusatory instrument alleged sufficient facts to put them on active notice of what the defendant was being charged with.

32.     The detailed arguments that defense presents, i.e. whether the police order to cease filming in the Precinct lobby (which the defense concedes was given) was lawful, are valid arguments to a trier of fact and not the subject of a motion to dismiss. The facts as the People allege them make out the charges of trespass and OGA, the defense is free to argue to the Jury or to the bench that they should have a different interpretation of the facts. But that does not mean that the People's complaint is facially insufficient.

### A.  FACIAL SUFFICIENCY STANDARD

33.     Defendant's motion claims the case should be dismissed because the People's accusatory instrument is facially insufficient, and the trespass counts are duplicitous.  Further, the defendant claims that the People's accusatory instrument "fails to establish that any specific crime occurred" An accusatory instrument is facially sufficient when the alleged facts provide reasonable cause to believe that the defendant committed the offenses charged. CPL §§ 70.10(2), 100.40(4)(b); *People v. Dumas*, 68 N.Y.2d 729 (1986). Reasonable cause exists when the alleged facts and circumstances "would convince a person of ordinary intelligence, judgment, and experience that such offenses were reasonably likely to have been committed . . . by the defendant." *Id.* The allegations should not be given an overly restrictive or technical reading and must be viewed in the light most favorable to the People. *People v. Casey*, 95 N.Y.2d 354, 360 (2000); *People v. Contes*, 60 N.Y.2d 620 (1983). In reviewing an accusatory instrument for facial sufficiency, the Court must assume the truth of the factual allegations and consider all favorable inferences drawn therefrom. CPL §§ 100.40 and 100.15; *People v. Mellish*, 4 Misc.3d 1013(A)

(Crim Ct, N.Y. County 2004). New York Courts have upheld a complaint when (i) the defendant has sufficient notice to prepare a defense and (ii) the factual allegations are adequately detailed to prevent the defendant from being tried twice for the same offense. *People v. Casey*, 95 NY2d 354, 360 (2000)). Additionally, Section 60.50 merely requires, "'some proof, of whatever weight', that the offense charged has in fact been committed by someone." *People v. Booden*, 69 N.Y.2d 185, 187 (1987).

34.     The accusatory instrument in the present case meets these requirements. The accusatory instrument lays out that the defendant in this case was, "video recording within the Police station" using a "cellphone, tripod, microphone and a smartwatch." The complaint further states that officers, who were performing their official duties within the precinct, instructed the defendant to stop filming and that the defendant refused to comply with that request. And finally, the complaint establishes that the officers instructed the defendant to leave the police station and that the defendant re-entered the premises after being escorted out.

35.     These facts, when viewed in the light most favorable to the People and considering all favorable inferences, would clearly allow a person of ordinary intelligence, judgment, and experience to conclude that the defendant committed the offenses of remaining unlawfully in a building after his license/privilege to be in the building had been revoked and interfering with a public servant performing an official function.

## B.  THE PEOPLE'S ACCUSATORY INSTRUMENT SUFFICIENTLY PLEADS TRESPASS AND CRIMINAL TRESPASS: DEFENDANT REFUSED A LAWFUL ORDER TO LEAVE THE PRECINCT.

36.     A person is guilty of trespass when he, "knowingly enters or remains unlawfully in or upon premises." A person, "enters or remains unlawfully" in or upon a premises when he is not licensed or privileged to do so. When the location of the alleged trespass is a premises open to the

public the People have the burden of proving that a lawful order excluding the defendant from the premises was issued, that the order was communicated to the defendant by a person with authority to make the order, and that the defendant defied the order. P.L. § 140.00(5); *People v. Munroe*, 18 Misc. 3d 9 (2d Dep. 2007).

37.     The factual allegations in the accusatory instrument, read in the light most favorable to the People, more than satisfies this requirement.  The accusatory instrument states that the defendant entered the 75th Precinct, that the defendant was asked to stop filming by an officer of the precinct, that the defendant refused, and that the defendant was then ordered to leave the precinct and that he refused to do so and that he re-entered immediately after being escorted out. Those facts provide reasonable cause to believe that the defendant defied an order from an authorized person and re-entered public location after his license to do so had been revoked.

### C.  DEFENSE MISSTATES THE MEANING OF "LAWFUL ORDER"

38.     In their motion, Defense argues that the Trespass charges are insufficiently charged because there is nothing in the complaint which establishes that "the order requiring Mr. Reyes to abstain from filming inside the precinct was lawful."  In making this argument the defense both misstates what is required to establish trespass and misstates what the accusatory instrument alleges.

39.     Defense claims that the issue of this case is whether the order to stop filming was lawful.[2] Setting aside the fact that the order to stop filming was entirely legal [as discussed further throughout this motion]. This is simply not correct. As discussed above, to establish trespass in a public place, it is required that a lawful order be issued *excluding the defendant from the premises*.

---

[2] Defendant's Motion, ""At issue in this case is whether the order requiring Mr. Reyes to abstain from filming inside the precinct was lawful. If it was not, then the complaint does not sufficiently establish a key element of trespass: that Mr. Reyes entered or remained in the 75 lobby unlawfully."

Here the complaint specifically states that, "[the Officer] asked the defendant to leave the Police Station." This is the order at issue here—not the order to stop filming. If the complaint alleges that a lawful order to leave was given, then the complaint sufficiently establishes that the defendant re-entered the 75th Precinct unlawfully.

40.     The issue then becomes whether the Officer's order for the defendant to *leave* the precinct is lawful. Viewing the evidence in the light most favorable to the People and making all favorable inferences to the People, the accusatory instrument clearly establishes that a lawful order was given. In the context of Trespass, the term *lawful order* applies when the person who revoked the defendant's license to be on the premises had authority and a legitimate basis to do so. There exists no statutory or judicial requirement that the order to leave be in reaction to an independently illegal action or even that this order be authorized by a rule or statute. The defense is trying to stretch the word "lawful" to suggest that trespass requires an order to leave only after the defendant engages in unlawful activity. Public policy, sound reason, and case law make clear that this is not the case.

### D.  LEGAL ACTIVITIES CAN STILL SUBJECT SOMEONE TO A LAWFUL ORDER NOT TO ENTER OR REMAIN

41.     The reason that Police Officer Ortega issued a lawful order to the defendant to leave and not return to the 75th Precinct is described in the Information as follows:

   a.  DEPONENT OBSERVED THE DEFENDANT VIDEO RECORDING WITHIN THE POLICE STATION AND …

   b.  THE DEPONENT ASKED THE DEFENDANT TO STOP VIDEO RECORDING WITH THE DEFENDANT'S CELLPHONE, TRIPOD, MICROPHONE, AND A SMARTWATCH AND …

   c.  DEFENDANT CONTINUED TO VIDEO RECORD AND …

   d.  [THE DEFENDANT] REFUSED TO COMPLY

42.     The four corners of the complaint make clear why the deponent, a Police Officer working inside a Police Precinct servicing Brownsville and East New York Brooklyn, ordered the defendant to leave the precinct. The Officer issued his order to the leave the Precinct after 1) seeing the defendant video recording 2) while he was carrying a cellphone, tripod, microphone, and a smartwatch to record and 3) upon being told to stop refused and continued to record in the location.

43. Maintaining the sanctity of the police precinct is an important function. The police precinct is the primary locus of interaction between the community and law enforcement. The police precinct is more than merely a location to report or investigate crime. While many use the 911 service to report crime, there are a myriad of functions that NYPD serves in a community beyond emergency service. Many of these roles require the utmost level of discretion due to the sensitive nature of the subject. These functions include but are not limited to receiving anonymously abandoned babies from those unable or unwilling to care for them, receiving guns from the community anonymously, taking anonymous tips through the NYPD Crimestoppers line, and taking reports or following up on reports of sexual abuse and other special victim offenses. NYPD receives complaints at their precinct from all sources and never questions immigration status to ensure that the public is not fearful in reporting crimes. Imagine the alarm that any one of these individuals would have to be recorded on a video that is being posted to the internet. If an officer stationed at a precinct failed to exclude such an individual from such a sacred space, the public uproar of such an abdication of duty would be deafening. These concerns are especially pressing considering the vast online audience defendant has amassed from his viral interactions with public servants.[3] That the precinct in question is also one of the highest violent crime reporting precincts in the city makes counsel's

---

[3] As of the writing of this motion, the YouTube video defendant posted of his interaction with the police in the lobby of the 75th precinct has over 469,000 views. See *infra* p. 2 ¶ 17.

position even more tenuous. The protection of the anonymity of those approaching or interfacing in that space is sacrosanct.

44.     It simply fails any test of logic or sound reason to find that an exclusion from a public space must be based on an independently criminal action. The ability to regulate public spaces for specific functions is required to maintain the nature of any space. How could anyone maintain a theater if their exclusion of patrons who smoked or talked on the phone during a performance were deemed to be an unlawful order to leave?

45.     For example, if an individual entered a public library and began to shout and play music loudly and a library employee asked them to stop, they refused to stop and then the library employee asked them to leave, and they refused; that person can be charged with trespass. They can be charged with trespass not because of the shouting and loud music is specifically illegal, but because the librarian, a custodian of the library with the lawful authority had a legitimate basis (the disruptive nature of the shouting) to ask the individual to leave and did so—in other words, revoked their license to be on the premises, and the individual refused to leave.

46.     In a case like that, the People would not be required to prove that the librarian's initial request to stop shouting was "lawful" by detailing or defending the library's code of conduct. All the People would be required to do is establish that a person with authority and a legitimate basis ordered the defendant to leave and that the defendant either refused to or reentered.

47.     Perfectly legal activities can still trigger a lawful order to leave a premises. For example, pushups are a legal activity, and there are plenty of situations in which it is legal to do pushups in a public space, such as a park. However, if a civilian were to enter a police lobby and start doing pushups, a police officer would be authorized to give the defendant a lawful order to leave the premises. In that situation, the People would not have to prove or litigate the NYPD's policy on exercising in their lobbies to prove that a lawful order was given. The People would only

have to prove (or allege) that an authorized person ordered the defendant to leave and that that order was ignored.

48.     This interpretation of the phrase "lawful order" is supported by the very case that defense cites when establishing the elements of Trespass. *People v. Munroe*, 18 Misc.3d 9 (2d Dep. 2007). In that case, the court found that a trespass occurred after the defendant, a former professor at a university, arrived at the Academic Arts building and demanded to see a personnel file. The court found that the defendant trespassed after he was informed multiple times that he would not be given his personnel file and asked to leave the premises by the Dean and Campus security.

49.     In that case, the court did not state the People needed to independently allege the defendant was breaking a law, policy, or regulation before establishing that the Dean's order for the defendant to leave was "lawful." Furthermore, there was no analysis of whether the Dean's decision, or the university's policy, to not provide personnel files on demand was lawful. What was given credence in the court's decision was the fact that the Dean and the university staff were authorized personnel and that they had a legitimate basis to ask the defendant to leave. *Munroe,* 18 Misc.3d at 10.  According to the court, "once defendant was told that he would not be given his personnel file, there was a legitimate basis for his being asked to leave." *Id.* at 11. The court further noted this order to leave was lawful even though the location defendant was ordered to exit was a public place. *Id.*

50.     If the statute were to be read as the defense suggests, the People would have been required to establish that demanding the personnel file is illegal or that the university's police restricting access to personnel files is an element of the crime of trespass. There was no analysis of this sort at all in the case. In fact, even if a court found that a specific university policy such as a policy that prohibited former employees from requesting their personnel files was illegal, that

does not negate the fact that a trespass occurred. The fact remains that an authorized person ordered the defendant out of the premises and the defendant remained.

51.     Since there is obviously no law against demanding or requesting a personnel file, it is clear that the court in *Munroe* did not intend for the phrase "lawful order" to create a requirement that an order to leave be based on either a specifically prohibited activity or in a specific right of the individual being ordered. Rather, by using the phrase "lawful order" it is clear that the court to simply meant to establish that a trespass occurs when someone with authority or custodianship over a public space orders a person to leave on a legitimate basis.

52.     Other cases which cite to *Munroe* make this clear. *Carpenter v City of NY*, 984 F. Supp.2d 255 (S.D.N.Y. 2013)*,* involved a false arrest claim brought by Occupy Wall Street protesters who protested inside a Citibank in Manhattan.  After entering the bank's reception area, the group sat in a circle and "aired their grievances about the banking system" while filming their activity. *Id.* at 261.  A bank employee asked them to leave as they were violating the non-filming rules inside the bank.  *Id.* The police were eventually called, and the protesters were arrested for Trespass among other counts.  *Id.* At 262.  The reception area of the bank was open to the public at the time. *Id.* at 265*.*  The Court dismissed the false arrest claim by finding that a "reasonable police officer was entitled to conclude that the statements of the bank employees delivered to the protestors were lawful orders excluding the protestors from continuing protest activities within the bank's premises." *Id.*

53.     This decision, although in the context of false arrest, makes it clear that the *Carpenter* court's position on the phrase "lawful order" aligns with the People's.  In concluding that "the arresting officers had probable cause to believe that the plaintiffs committed the crime of criminal trespass," the court did not address whether the plaintiff's act of engaging in political protest in a public area was itself legal. *Carpenter*, 984 F. Supp.2d at 265.  Instead, it determined

the police executed a lawful arrest for criminal trespass because a lawful order to leave the premises was given by an authorized person with a legitimate basis to do so, and the protestors refused to comply.  *Id.*

54.    Similarly, in *Omor v. City of New York* the Court found that, in the context of a false arrest claim, there was probable cause to arrest defendant for criminal trespass after he refused to give up his seat or leave the premises of a Human Resources Administration ("HRA") facility after employees ordered him to do so.  In this decision, there is no analysis of whether the employee's had a "right" to order the defendant out, whether defendant was engaged in unlawful activity before this order was made, or any interpretation of the HRA facility's policies regarding when someone can be ordered out.  All that was required for a trespass is a refusal to obey an order by someone with authority over the premises and a legitimate basis for said order. *Omor v. City of N.Y.,* No. 13-CV-2439 (RA), 2015 U.S. Dist. LEXIS 24135 (S.D.N.Y. Feb. 27, 2015).

55.    In *People v Taylor,* The Second Department held that when a librarian ordered a defendant out of a library because the defendant was playing chess, the defendant, "lost his license and privilege of remaining in the library when he defied lawful orders not to remain there personally communicated to him by people with the requisite authority." *People v. Taylor*, 164 Misc. 2d 868, 869 (2d Dep. App. Term 1995).  In *Taylor*, the legitimate basis for the library personnel's order for defendant to leave was that defendant was playing chess in contravention of "the library's ban against the playing of cards and board games on its premises." *Id.*  If the Court accepts this interpretation of "lawful" order, then the People's complaint sufficiently makes out that a lawful order was issued to defendant. If the Dean of a university, a bank employee, or a librarian can be an authorized person to order someone out of a university building, bank, or librarian, then a police officer can clearly give a lawful order to someone to leave a Precinct.

### E. THE DEFENDANTS CONDUCT AND MANNER OF FILMING CREATED A LEGITIMATE BASIS TO ORDER THE DEFENDANT OUT OF THE PRECICNT.

56. The question then becomes one of whether there was a legitimate basis. Regardless of the scope of the NYPD's filming rule, there is no question that in *this case, given these facts*, the Officers had a legitimate basis to order the defendant out of the lobby of the Precinct.

57.     Defense is incorrect when claiming there is "nothing in the four corners to support the inference that the NYPD officer had any right to order Mr. Reyes to leave the building or to stop recording." Def. Mot. at 10.  The complaint establishes that the deponent is a police officer who was performing official duties inside the 75th Precinct. The complaint also establishes that the officer is a custodian of the Precinct. It is reasonable to infer that a police officer, performing their official duties within a police precinct has the authority to order a civilian out of that precinct. This is particularly true when the complaint alleges that the civilian refused to comply with the requests of the custodian.

58.     Federal case law addressing disruptive activity in other public spaces further reinforces the People's position.  Specifically, in *People v Hedemann,* 107 Misc 2d 241 (1st Dep. App Term 1981), the court found that there was probable cause for a trespass arrest when the defendant defied an order to not pass out leaflets in an IRS office. Because "[e]ven where municipal or State property is open to the public generally, the exercise of First Amendment rights may be regulated so as to prevent interference with the ordinary use of the property by other members of the public with an equal right of access to it. *Food Employees v Logan Plaza*, 391 U.S. 308, 320-321. The defendant does not have an absolute right to use all parts of a public building or its immediate environs for his unlimited expressive purposes. *Adderley v Florida*, 385 U.S. 39; *Cox v Louisiana*, 379 U.S. 559. The critical question is whether the manner of expression

is basically incompatible with the normal activity of a particular place at a particular time. *Grayned v City of Rockford,* 408 U.S. 104, 116."

59.     In *People v. Bembry* the court stated that a "person can be found guilty of trespassing upon entering a public building under certain circumstances. The Oneida County Sheriff's Department assigns officers to the County Building for the purpose of protecting citizens therein both as employees and users. They have the authority to direct persons to leave the building when causing disturbances therein. *People v. Bembry*, 128 Misc. 2d 243, 490 N.Y.S.2d 431, 1985 N.Y. Misc. LEXIS 3342.

60.     In *People v. Omor* the court found that: To the extent Plaintiff asserts that the arrest violated his First Amendment rights, that claim also fails. Although he testified at his deposition that Defendants violated his right to "peacefully assemble" at the HRA office, Plaintiff has not specified how the defendant officers prevented him from exercising his First Amendment rights. Assuming that his claim, liberally construed, asserts that the arrest was an unlawful restriction on his right to protest the HRA's financial assistance, such claim cannot succeed. While the HRA office is a local government office open to the public, it is not a public forum "that has as a principal purpose . . . the free exchange of ideas." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-80, (1992) (distinguishing between non-public forum government property where members of the public are freely allowed to enter, and public forum intentionally created for public discourse); *Perry v. McDonald*, 280 F.3d 159, 166 (2d Cir. 2001). Restrictions on speech in a non-public forum—including those based on subject matter and speaker identity—are lawful "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Byrne v. Rutledge*, 623 F.3d 46, 54 (2d Cir. 2010) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund. Inc*., 473 U.S. 788, 806 (1985)). Here, there is no evidence that Defendants' actions were unreasonable in light of the purposes served by the government building,

or motivated by the content of Plaintiff's expressive speech. See *U.S. v. Murtari*, 120 F. App'x 378, 380 (2004) (finding no First Amendment violation where criminal defendant was arrested for trespass and disorderly conduct at Syracuse Federal Building)

61.     These cases clearly indicate that custodians of public places (specifically police precincts) can lawfully exclude or give orders to leave when an individual's otherwise "legal" or constitutionally protected activity interferes with the typical use of that premises. The current case is comparable to the above cases in that, although the police precinct is open to the public, it is not a purely "public forum." The precinct's purpose is not to facilitate the free exchange of ideas, and the officer's order for the defendant to leave was a narrowly tailored order focused on ensuring that the precinct could be used for it intended purpose and not rooted in a desire to suppress the defendant's expression/speech.

62.     Setting aside the issue of whether filming inside a police precinct is illegal on its face or an automatic reason for ordering someone out, the way the defendant was filming in *this incident* clearly interfered with the use of that space, which created a legitimate basis for the police officers to ask him to leave. The defendant in this case was not simply filming a private conversation between him and officer on his cellphone or with a handheld device. Rather, the defendant walked into a police precinct with a camera a microphone and a tripod. This method of filming is the opposite of discreet and interferes with the proper functioning of a police precinct.

63.     Defense correctly cites to *People v. Reape,* 22 Misc. 3d 615 (Kings Cty. Crim. Ct. 2008) to analyze the facially sufficiency of trespass within a police precinct. However, defendant's citation to this case misrepresents the holding:

>       In *Reape*, the court found an accusatory instrument charging trespass in a police precinct was facially sufficient when it alleged that, prior to being ordered to leave the precinct, the defendant was "'yelling and screaming' and adamantly demanded to see a particular detective [in a manner which] interfere[d] with the ordinary use of the property...." (*id*. at 619). Defense Motion at 11.

64.     A full reading of the context of the case reveals its harmony with the People's position here. The *Reape* court found a sufficient and lawful order to exclude was issued because "the defendant was unable to give a valid reason for being at the precinct, was told that the police detective he sought did not work at that precinct, and was asked by a police officer to leave, but that the defendant refused to do so." *Id.* at 617. While the court also noted the defendant was yelling and screaming and adamantly demanded to see a particular detective, that was not the touchpoint of the decision. Instead, what the court considered "[m]ost significant, is the fact that the complaint makes it clear that the defendant was asked to leave the precinct area and refused to do so." In selectively quoting *Reape*, defendant creates the impression that *Reape* is distinguishable from this case, when in fact the opposite is true.

65.     Additionally, that court found that the location of the offense, a precinct, was an important part in determining the lawfulness of the order to exclude. They noted that a police precinct is, "an area used by law enforcement officials in order to ensure the public safety, and by other citizens who seek to give or obtain information about public safety. Prisoners are frequently transported in and out of police precincts and must be able to be reasonably moved and secured. Those who enter in order to use the facilities also need to know that their safety is being protected while they are present there...".

66.     The decision even clarifies that an officer is also legally authorized to exclude individuals behaving in a disruptive manner noting that, "[an NYPD] officer is clearly the custodian of such premises and its environs and Police Officer Benjamin Perez was in the best position to know whether the defendant had acted in a way that required him to be asked to leave the premises." *Id.* at 619. While the decision cited to the defendant's "yelling and screaming" to note that there was an inconclusive danger that, "the defendant intended to bring harm to a Police Department employee or cause some other type of harm," the decision to exclude ultimately also

involved a determination that "allowing the defendant to stay upon the precinct property would interfere with the ordinary use of the property of the Police Department and by other members of the public." *Id.* at 619.

67.     The situation in *Reape* is comparable to the present situation. Similar to *Reape* the Officer in this case is clearly the custodian of the premises and was in the best position that to know whether the defendant had acted in a way that required him to be asked to leave the premises. In *Reape* the court found that totality of the circumstances—the fact that the defendant had no reason to be in the police station, the repeated demands for a police officer, and the yelling—created a situation in which allowing the defendant to stay on precinct property would interfere with the ordinary use of the property.   If the defendant in *Reape* had sat quietly in the corner and demanded to see a Detective every 10 minutes he might not have been ordered out because his activity would not be one that that interferes with the use of property. However, the officer had a right to order the defendant out because he acted in a way that was so disruptive that the precinct could no longer be used in the manner it was intended for meaning. The current complaint states that the defendant had entered a Police station, without any valid reason, while using a tripod and refused commands to stop filming, The nature of the filming should be considered in this case, to the same extent yelling and screaming is in the Reape case.

68. One of the main purposes of a publicly accessible lobby of a police station is to create an area where civilians can enter the precinct seek assistance/services from the Precinct. Civilians enter the lobby for numerous reasons—some of an extremely sensitive nature. In their motion, defense tries to downplay the importance of the business conducted in a police precinct. The defense asserts, with absolutely no support, that "few serious" crimes are reported by a complainant who walks into a precinct. The defense does not elaborate on what they consider a "serious" crime (the People would contend that all civilians are entitled to privacy regardless of what the defendant

considers of the seriousness of their complaint) and completely ignores that fact that for many civilians (for example those without phones, or those who do not speak English) the lobby of a precinct is the only channel for which they can seek police assistance.

69.     A key part of allowing a police precinct to provide its intended purpose to the public is ensuring that civilians feel comfortable walking into the Precinct to conduct whatever business is necessary. Obviously, the type of screaming and yelling described in *Reape* interferes with that purpose. Civilians could be scared or intimidated by the screaming or simply not be able to clearly communicate to the police. Filming also interferes with that purpose. It is not unreasonable for an officer to decide that an individual standing in the lobby near the entrance with a tripod, camera, microphone might discourage civilians from doing what they came to the Precinct to do.

70.     An individual who arrived at the 75th Precinct with the intention of reporting a crime likely feels some level of fear or apprehension even in the absence of interference from others. Civilians arrive at the Precinct and anticipate some level of protection and discretion. The presence of an individual standing in the lobby with recording equipment could make a civilian feel as if their presence in that lobby will be recorded and either broadcast live or posted on social media (as the defendant did in this case).

71. In their motion, the defense attempts to equate the prospect of being filmed by a stranger inside the precinct with being recorded by body-worn camera ("BWC") or surveillance footage by the police and implies that someone uncomfortable with being recorded would not come into a precinct anyway. This ignores the significant differences between these two types of "recording": BWC and surveillance footage is done by the NYPD, a public institution, which may be (and frequently is) subject to protective orders to ensure that personally identifying information is redacted from this footage before being entered into the public record. See C.P.L. § 245.70(1). The nature of defendant's recording could hardly be more different, since it is done for purposes

of (as the defendant admits) expression and viral marketing rather than public safety. A victim of, say, a sexual assault would likely think twice about going to a precinct to report a crime if a random stranger, bearing sophisticated recording equipment, were capturing every detail of that victim's interaction with the police for that stranger's own commercial or expressive purposes.

72. If the Court were to apply the same analysis as was applied in *Reape,* the court should find that the officers in this case reasonably concluded that allowing the defendant to stay and film in an obvious and disruptive manner interferes with the ordinary use of the property. This forms the legitimate basis upon which the police could then order the defendant to leave the property.

73. The ruling in *Reape* also underlines the People's above point that a lawful order does not require underlying activity to be specifically illegal. Yelling, screaming, and demanding to see a detective is a legal activity. But just because the underlying conduct might be "constitutional" or otherwise legal does not mean that that conduct, when combined with other factors, cannot create a situation that interferes with the use of property giving way to the custodian's right to order the defendant to leave.

74. There is also no evidence in this case that the Officer's decision to order the defendant out of the Precinct was in anyway motivated by the content of the defendant's expression. When the defendant entered the Precinct, the Officers had no idea who the defendant was or for what purpose he was filming. Nothing in the interaction gave the officers any indication of the defendant's political stance or reasoning for filming. Therefore, there is no way the officer's decision to order the defendant out could have been motivated by the content of the defendant's speech.

75. It is clear that the officers had a right to order the defendant out of the Precinct because they were concerned with ensuring the premises retained its intended purpose. The case

law clearly indicates that public officials have the right to give these types of narrowly tailored orders and that they are not violations of the First amendment.

76.     In any event, this point is moot because the NYPD's policy prohibiting filming in the Precinct is legal, as is discussed later in this response. Meaning that even if we accept the defense's clearly flawed interpretation of the trespass statute the People still sufficiently charged Trespass.

### F.  THE NO FILMING POLICY IS NOT NECESSARY FOR FACIAL SUFFICIENCY.

77.     The People do not have to mention the NYPD policy in their complaint for it to be considered when considering the lawfulness of the order. The defendant claims the court cannot consider the NYPD policy because it is not listed in the four corners of the complaint. That is simply not the case. To support this, the Defense once again presents a selective set of quotes from *People v. Pennisi*, 61 Misc. 3d 1224 (Crim. Ct. Queens Cty. 2018).  In *People v. Pennisi* the court is not deciding on the *lawfulness* of the order. Instead, the court is deciding whether the accusatory instrument alleges that an order was ever given—something that the Defense failed to mention in its motion. The complaint in *Pennisi* never specifically alleges that an order was given to leave. In *Pennisi*, the prosecution argued that their complaint was sufficient, despite never alleging that an order was given because of the fact that a policy banning the behavior at issue in that case existed and they therefore did not need to give or allege that an order to leave was given. It was in response to that argument that the court ruled that the policy could not be considered when determining facial sufficiency. There is no case law which supports the notion that in order for a order to be lawful, the underlying policy which supports/authorizes that order has to be mentioned in the complaint.

78.     For example, it would be absurd to hold that a complaint which alleges that a park ranger who ordered a defendant to leave a park because the defendant was attempting to light a fire need to specifically mention an arson statute in the four corners of the complaint for that complaint to be facially sufficient. It is a requirement of facial sufficiency analysis that all favorable inferences be given to the People and a not overly restrictive or technical reading be applied to the complaint. Requiring the People to mention that policy of the NYPD/Police Precincts to assess the lawfulness of the order would contradict those requirements. It is a reasonable inference to assume that an Officer's decision to order a clearly disruptive civilian out of Police Precinct would be based on a NYPD policy without having to specifically mention that policy in the four corners of the complaint.

79.     Although not controlling, the People urge the Court to follow an analysis similar to the one used by the Pennsylvania Superior Court in the case of *Commonwealth v. Bradley,* 2020 Pa. Super. 109 (Pa. Super. Ct. 2020), when approaching this case. The Pennsylvania trespass statute has similar elements to New York's Criminal Trespass statutes[4] and the facts in that case are almost identical to our own involving the same critical legal issues.

80.     In that case, the defendant entered a police station while recording video. Upon being confronted by a police officer who pointed to a NO RECORDING sign in the lobby, the officer ordered the defendant to cease filming or leave the precinct. That defendant refused while stating, "how the City of Williamsport was violating his rights, his constitutional rights, and made comments on his video asking the public to contact the police station." *Id* at 751. Following his conviction at trial, his appeal was taken before the Superior Court of Pennsylvania, their highest

---

[4] The criminal trespass statute provides in pertinent part: "(b) Defiant trespasser (1) A person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by (i) Actual communication to the actor[.] (c) Defenses.-- It is a defense to prosecution under this section that: (2) the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises[.]" 18 Pa.C.S.A. § 3503(b)(1), (c)(2) (emphasis added).

court. The Court affirmed his conviction noting, that "Corporal McGee testified that he informed [the defendant] that he was not licensed to remain in the police station if he did not cease filming. The record ... shows that Appellant did not comply. Instead, despite Corporal McGee's repeated commands to stop recording, Appellant continued to film in the Lobby, pointing his phone toward the secure area of the station. Accordingly, under the circumstances of this case whereby Corporal McGee gave repeated warnings to Appellant to stop filming, to cease or leave, and Appellant's refusal to comply, it is clear that Appellant had actual and direct notice that he was no longer licensed or privileged to remain in the Lobby. Thus, based upon the foregoing and viewed in a light most favorable to the Commonwealth, we agree with the trial court that the Commonwealth proved beyond a reasonable doubt that Appellant committed defiant trespass." *Id at* 758.

## G.  A POLICE PRECINCT IS ENCLOSED IN A MANNER DESIGNED TO EXCLUDE INTRUDERS.

81.     A police precinct is by definition a building designed to exclude intruders. One of the primary functions of a police department is the investigation and prevention of crime. Police officers routinely arrest and process defendants to the exclusion of outsiders. Secure areas of the precinct exist to prevent the escape of such prisoners. Escape from a police precinct is a Felony punishable by up to seven years in prison. The security of this facility is required by statute.

82.     There is in some sense no other public building more specifically designed to exclude intruders, with the exception of a jail or prison. And among NYPD precincts, the 75th Precinct has some of the most dangerous crimes and arrested individuals. For instance, in 2022 the 75th Precinct had 25 murders, 55 rapes, 747 robberies, 1,083 felony assaults, and 373 burglaries

reported.[5] During that time, witnesses and defendants to each of these crimes passed through the doors of this precinct in some form or fashion thousands of times.

83.     Police precincts, while they are accessible to the public, ARE in fact buildings designed to exclude intruders. There is a string of case law in which courts have found that hospitals, churches, and dentist offices are NOT buildings designed to exclude intruders. *See People v. Martinez,* 16 Misc 3d 1111[A], [N.Y. Dist. Crt. Nassau County 2007][church]; *People v. Warren,* 173 Misc. 2d 864, [Monroe Co. Ct., 1997][hospital]; *People v. Santos,* 182 Misc. 2d 764 [Crim. Ct., New York County 1999][dentist office]. None of these decisions are controlling but more importantly none of these cases feature the issues that a police precinct does.

84.     A police precinct is easily distinguishable from these types of buildings, because while there is a level of accessibility in a police station, it is also designed and operated with the purpose of excluding intruders. Although there might be a security guard at a hospital, a hospital operates much differently from a police precinct. At a hospital, people are typically able to come and go. A dentist office operates roughly the same way, while with a church it is almost presumed that anyone off the street could enter. A police precinct operates the opposite way: although civilians may enter through the front door, there is a presumption that anyone who enters must immediately state their business and purpose for entering. There are officers stationed at the lobby entrance whose sole job is to monitor who comes in and out – we know that because this case's deponent was performing that duty at the time of this incident. That is because precincts have an interest in ensuring that individuals without a legitimate purpose for being there do not enter or remain in the precinct.

---

[5] NYPD Borough and Crime Statistics at https://www.nyc.gov/site/nypd/stats/crime-statistics/borough-and-precinct-crime-stats.page#brooklyn.

85.     The four corners of the information in this case make clear that this incident occurred inside a police precinct. The doors are clearly designed to exclude intruders since after the defendant was excluded from the precinct, he sought reentry and was arrested thereafter. The facts alleged are sufficient to lead a reasonable person making all favorable influences to conclude that the defendant had trespassed in a building designed to exclude intruders.

## H. THE   COUNTS   IN   THE   ACCUSATORY   INSTRUMENT   ARE   NOT   DUPLICITOUS

86.     Defense asserts that the counts of trespass are duplicitous. The principle of duplicity is that each count may charge one offense only and that acts which separately and individually make out distinct crimes must be charged in separate and distinct counts. The Court of Appeals has held that, "[a]s a general rule, however, it may be said that where a defendant, in an uninterrupted course of conduct directed at a single victim, violates a single provision of the Penal Law, he commits but a single crime. Thus, a physical attack by one person upon another is normally but one assault, though the attacker may hit the victim several times." *People v. Alonzo*, 16 NY3d 267 (2011).

87.     What is described in the complaint is a single crime. That is why the defendant is only charged with one count. The complaint in this case describes an uninterrupted course of conduct and covers a relatively brief period between which the defendant during which the defendant committed one crime—trespass.

88.     The defendant trespassed when he re-entered the premises after being ordered out. The complaint specifically elicits that he was being arrested for that reentry. Just because the defendant's initial action of refusing to leave could by itself have constituted a trespass does not mean that the defendants one uninterrupted course of conduct needs to be charged as multiple crimes. This is the same logic that applies to an assault case, just because a first swing or hit could

by itself qualify as an assault does not mean that the People would be required to give a separate charge. When a crime is committed in one uninterrupted course of action one count is charged for that crime, even if individual actions within that course of conduct, when isolated, could in themselves make out that crime.

89.     If the People were to charge as the defense suggested here, it would lead to an issue of multiplicity. Multiplicity bars charging one offense in several counts. *People v. Senisi,* 196 AD2d 376 (2d Dep. 1994); *See also People v. Alonzo, supra.* It would be absurd for the People to charge the defendant with two counts of trespass for this same interaction. Defense's argument is circular—in one breath defense is claiming the People are being duplicitous, but if the People charged as the Defense suggested, they would surely raise the issue of multiplicity, putting the People in an untenable position.

90.     This is exactly why continuous course of conduct is charged as one event, the ban on multiplicity is not meant to apply to situations like this, it is meant to apply to situations where non continuous course of conducted are charged as one offense. *See People v. Bauman*, 12 NY3d 153 (2009) (11 incidents over an eight-month period, assault charge held duplicitous). Furthermore, even if the court were to find that the complaint was duplicitous, dismissal of the charges would not be the remedy. A bill of particulars may clarify which crimes are alleged and thus cure a facially duplicitous indictment. *People v. Drayton*, 198 AD2d 770 (4th Dep. 1993). Jury instructions may also cure duplicity. *People v. Caballero,* 23 AD3d 1031 (4th Dep. 2005).

## I.   OBSTRUCTING GOVERNMENTAL ADMINISTRATION IS SUFFICIENTLY PLED:

91. The defendant is charged with Obstructing Governmental Administration ("OGA") in the Second Degree pursuant to Penal Law § 195.05. The facts as alleged in the complaint sufficiently provide notice to satisfy the elements of this charge.  An individual commits OGA when he "intentionally

obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." P.L. § 195.05.

92. The complaint establishes that the deponent was inside the 75th Precinct and that he gave a command to a civilian inside that Precinct to stop filming. The complaint further alleges that the defendant defied that order and continued to defy that order until the defendant had to be physically escorted out of the Precinct. After being physically removed from the Precinct, the defendant, in contravention of the officers' order to remain outside, reentered the premises.

93. The defendant "intentionally obstructed, impaired and perverted the administration of law or other governmental function" by entering the precinct with conspicuous recording equipment, recording with it despite being ordered to stop or leave, and then returning inside the precinct immediately after being ejected. Such intent can be inferred from the facts as alleged in the complaint in that the defendant was ordered both to stop recording and to leave and his reentry was the triggering factor for arrest and prosecution. There is ample evidence that defendant's intent was not for to file a complaint as asserted in defense's motion, but instead to generate a videotaped conflict with Police that could be posted on his social media channels to generate money. Posting viral content is the occupation of the defendant. Each post generates significant revenue that by defendant's own admission generates over half of a million dollars a year. The videos related to this incident have garnered significant views and comments that YouTube uses to calculate money to pay content creators like the defendant. While there is no dispute that as a general matter this is a lawful enterprise, as will be discussed in greater detail below, the defendant's right to broadcast his escapades does not nullify a police officer's mandate to ensure a police precinct is a welcoming and orderly place for victims of violent crime.

94.     On the date of this incident, the motive and purpose of the defendant's presence at the 75th Precinct was to engage in a revenue-generating social media endeavor. The defendant posts on his social media accounts videos of interactions with police officers. A cursory review of his YouTube page reveals that the videos that generate the most views, and hence most revenue, are the ones involving the most contentious interactions with police officers. The content created for these sites involve the police as foils in the videos used to generate revenue. The videos generated by the defendant thrust the defendant into the story as opposed to a discussion of issues surrounding police behavior. The response of police to the defendant's behavior is in the same genre as the response of the unwitting audience to Candid Camera or movies such as Jack***[6]. The parallel to such a movie is apt as the revenue generated by that series of films is based on the reactions of unwitting participants in a physical gag. The difference however is that footage from such reactions were only used to the extent the unwitting participant negotiated the usage of their footage for profit or signed a release[7]. Here, there was no actual complaint filed by the defendant or any discussion/investigation into the internal workings of the 75th Pct, but the interaction was recorded, and controversy generated for the purpose of maximizing the police response to the defendant's behavior.

95.     The defendant claims that his purpose was to file a report, however that is the same claim raised in almost every video posted on his site. Additionally, the defendant lives in, and is incorporated as, Long Island Audit. The defendant's concerns that existed in the 75 Precinct continue to be a mystery as the intended 61 was never filed by the defendant. In addition, it is curious that the defendant *chose* to file his complaint in person draped in conspicuous filming

---

[6] The movie title is redacted due to its prurient nature but is a series of movies and television series featuring the actor Johnny Knoxville.

[7] *See generally* ARTICLE: Liable, Naaaht: The Mockumentary: Litigation, Liability and the First Amendment in the Works of Sacha Baron Cohen, 13 Harv. J. of Sports & Ent. Law 141 (discussing the interaction of the First Amendment; privacy, tort and contract law; and specifically the necessity of having a general release signed to use footage for commercial purposes).

equipment accompanied by a cohort also carrying large conspicuous filming equipment. Particularly so given that counsel has argued that the lobby of a police precinct is not sacrosanct as there are many ways to generate a police report that don't involve visiting the precinct[8]. These facts evince that the intent of the defendant was not journalistic, or law enforcement related, but specifically to generate clicks and money.

96.     Journalists who want to investigate police or other governmental institutions can and do receive a "Press Card" issued by the Mayor's Office of Media and Entertainment through the Press Credentials Office. A Press Card is required to, "cross police, fire lines, or other restrictions, limitations or barriers established by the City government at emergency, spot, or breaking news events and non-emergency public events and attend City-government-sponsored events that are open to members of the press." Receiving such credentials are subject to a review process and result in having credentials that grant the press access to spaces for journalistic purposes. No such press card was presented, or efforts made to perform journalism within the reasonable time place and manner restrictions imposed at the police precinct.

97.     The Governmental function that the defendant interfered with was the officer's ability to maintain the safe and orderly operation of the public area of a police precinct. Officers within the confines of a Precinct are tasked with ensuring that the Precincts operates in a way that allows officers to carry out their duties to the public. The lobbies of police precincts are a vital location for the administration of law and public safety. Police precincts lobbies are one of the main connectors of the NYPD to the civilians they serve. Civilians who walk into the precinct can be in the middle of an emergency, looking for safety, be in the middle of a mental health crisis, or be seeking medical attention. It is vital that Police Officers in a precinct be ready to respond to those civilians when they enter the lobby.

---

[8] Defendant's Reply Memorandum of Law in Further Support Pg. 8—9.

98.     An inference can be made that an NYPD officer inside of a precinct has the responsibility to maintain said precinct when observing an individual behaving in the manner that the defendant did. Such inference, in evaluating a motion to dismiss for facial insufficiency, is required and supplies the necessary facts. If a member of the public observed police officers *not* responding to the defendant behaving as he did that day, they would be reluctant to report or cooperate with law enforcement authorities. The inability of the police to maintain order in their own station would be message sent to the community that the citizens are helpless and thus an inference that an officer's duties would require such intervention is reasonable and necessary.

99.     As discussed above, by standing in the lobby with obvious and disruptive filming equipment the defendant was creating a disturbance in the precinct lobby. Upon seeing this disturbance the Officers in the Precinct ordered the defendant to stop filming and leave, once the defendant defied those orders it was at that point that the defendant began interfering with the Officers' official function. The defendant created a situation in which Officers had to step away from whatever duties they were performing in that moment to address this disturbance and make the precinct safe for the public.

100.    The manner employed by the defendant in this case was "intimidation, physical force, interference and an independently criminal act". Entering a police facility and conspicuously recording in the lobby while both refusing to leave, taunting the responding officers, and reentering the facility are actions meant to communicate defiance boldly which is the heart of intimidation. The physical force used was upon his reentry and attempt to move through the police to continue his recording. The interference has been described above and his reentry is charged in the complaint as a Trespass count. The facts necessary to satisfy these elements are plainly obvious from the text of the Information.

101.    The simple act of creating such a disturbance that officers had to address is enough to establish that the defendant interfered with those official functions. One of the official functions that officers are performing when they are in a precinct is being ready/on call to respond to whatever needs may arise. Whether that is speaking with a victim that comes in, helping process an arrest or filing paperwork or providing information to a civilian-by creating a disturbance that required Officers to respond the defendant was requiring officers to deal with him disturbance rather than being available to assist with any of the numerous tasks that are required for a Police Precinct to function.

## J.   THE MOTION IS UNTIMELY

102.    A pre-trial motion must be filed within forty-five days after arraignment and before commencement of trial under C.P.L. § 255.20(1). There are two exceptions to this rule. The first exception is that the defendant raises a motion over forty-five days post-arraignment on grounds that the defendant "could not, with due diligence, have been previously aware, or which, for other good cause, could not reasonable have raised" within the forty-five day period. C.P.L. § 255.20(3). The second exception is that a court exercising its discretion may consider an untimely motion in the interest of justice or for good cause shown. *Id*.

103.    Facial sufficiency is generally a non-waivable, jurisdictional prerequisite to a valid prosecution. *See People v. Hall*, 48 N.Y.2d 927 (1979). As a result, courts have consistently found that an objection to facial sufficiency cannot be waived and may be raised at any time. *See People v. Casey*, 95 N.Y.2d 354 (2000). When such a defect existed prior to the implementation of C.P.L. § 30.30(5-a), which vitiates the ability of the People to stop the speedy trial clock while being only partially converted, the remedy was to dismiss only facially insufficient counts. *See e.g. People v. Delarosa*, 47 Misc. 3d 1213(A) (finding that the accusatory instrument was facially sufficient regarding P.L. §§ 240.30(1)(a) and 240.26(1) and dismissing only P.L. § 240.30(1)(b) for facial

insufficiency). Additionally, courts in Kings County have held that it is improper for defendants to lie in wait until significantly past what would have been the expiration of the speedy trial clock to bring a facial insufficiency challenge that would result in the entire accusatory instrument being dismissed and therefore declined to dismiss the accusatory instrument on those grounds. *See People v. Wilson*, 27 Misc 3d 1049, 1055 (Crim Ct, Kings Cty 2010) (finding that a defendant's facial sufficiency motion filed well after the expiration of the speedy trial time and after defendant failed to challenge the multiple statements of the readiness made by the People or to raise facial sufficiency as an issue was untimely and a result of defendant improperly lying in wait); *People v. Odoms*, 143 Misc. 2d 503, 505 (Crim Ct, Kings Cty 1989) (finding "a defendant cannot silently lie in wait, while C.P.L. § 30.30 time expires, to raise an objection to the facial sufficiency of an information that was apparent at all times and then ask the court to charge the People *ab initio*."); *People v. Anthony Richardson*, Dkt CR-011601-21KN (Perlmutter, J.), (declining to dismiss the entire accusatory instrument and dismissing only the V.T.L. § 402 charge that was found to be facially insufficient after the defense waited 122 days following the filing of the People's Certificate of Compliance and Statement of Readiness to raise the issue of facial sufficiency and finding the delay was an improper attempt by the defense to take strategic advantage of the requirements of C.P.L. § 30.30(5-a)).

104.    The situation in this case is comparable to what occurred in the cases cited above – the defense received the accusatory instrument at arraignments, they received a copy when they received initial discovery and they then received another copy when the People filed there COC with almost 20 days left. Despite this the defense waited until after the 90th day had passed to bring the instant challenge despite having had multiple court appearances and communications with the People during which to raise the issue. Furthermore, the defense in waiting so long has blown past the normal forty-five-day post-arraignment restriction on pre-trail motions under C.P.L. 255.20(1).

The defense, in claiming that the facial insufficiency is obvious necessarily precludes any claim by the defense that the claimed defect could not have been discovered by the defense significantly earlier in the pendency of the case and precludes any possible finding of good cause for the untimeliness of the instant motion by the Court. The defense, in waiting such an extended period of time to raise the issue is a clear demonstration of "lying in wait" – the very practice frowned upon by the court in *Wilson, Odoms,* and most recently in *Richardson*. It should be frowned upon here as well.

### K.  DISMISSAL OF THE ENTIRE ACCUSATORY INSTRUMENT IS IMPROPER.

105.    Even if the court found that one of the charges on the complaint is facially insufficient, the People's Statement of Readiness is not rendered invalid by the People's CPL § 30.30(5-a) certification, and the Court should deny the defendant's motion to dismiss the remaining counts. In this case, the People made a § 30.30(5-a) certification after believing in good faith that all of the counts in the accusatory instrument met the requirements of CPL §§ 100.15 and 100.40, and those counts not meeting the requirements have been dismissed.

106.    In *People v. Luzuriaga*, Docket No. CR-021910-21KN, at 6 (Crim. Ct. Kings Cty. 2022) (Perlmutter, J.), the court found that two of the counts in the People's information were facially insufficient but declined to dismiss the entire accusatory instrument because "[t]he Court does not believe that in drafting the Complaint or in certifying compliance with CPL § 30.30(5-a) that the People acted in bad faith or with a lack of due diligence." *See also People v. Carter*, 2022 N.Y. Misc. LEXIS 4483, at 4 (Crim. Ct. Kings Cty, 2022) (Glick, J.)  (Statement of Readiness valid where the court "does not find the CPL § 30.30[5-a] certification was invalid due to the court's dismissal of offending charges pursuant to CPL §§ 100.15, and 100.40."); *People v. Ventura*, 2023 N.Y. Misc. LEXIS 295, at 6-7, (Dist. Ct. Suffolk Cty. 2023) (holding that "where the People certified as to the legal sufficiency of all accusatory instruments, and some accusatory

instruments are later deemed facially insufficient, the initial CoC/SoR is nevertheless still valid as to the remaining accusatory instruments." [emphasis in original]).

107.     Even if the Court were to find that any of the charges are facially insufficient, which the people contend they are not, the Court should not dismiss the entire accusatory instrument but instead dismiss *only those counts* that the Court deems to be facially insufficient.

## II.  NYPD'S NO FILMING POLICY IS CONSTITUTIONAL AND DOES NOT VIOLATE THE RIGHT TO RECORD ACT OR CAPA.

108.     Defendant moves this court to declare the NYPD policy of not allowing filming in the precinct to be invalid under the Constitution, the City Administrative Procedure Act of New York City, and two recently passed City and State Statutes related to filming police. As described above, whether such policy exists or not, the People's charges will still stand. The actions of the defendant, even absent an official policy of NYPD, still constitutes behavior that the NYPD can proscribe in their precincts. Regardless, the defendant fails to show that any of the cited authorities are in conflict with the actions of the police in this case.

### A.  THE NYPD PRECINCT FILMING POLICY IS CONSTITUTIONAL

109.     Defense claims that the NYPD's trespass policy is unconstitutional, anti-transparency and not in accordance with the citywide administrative procedure act. The NYPD does not have a "trespass policy." In 2018 the NYPD made modified their patrol guide to state that "Members of the public are not allowed to photograph and/or record within Department Facilities." That is the "policy" that the NYPD established. The department then provided officers with methods of response to individuals who violate that policy. The Office informed officers that if they see individuals filming within a precinct, they as custodian of the precinct, should order those individuals out. The department then informed officers of the fact that, individuals who ignore

orders to leave are committing the offense of trespass and that response available to offices to address that trespass.

110.    The NYPD does not have "trespass" policy, the NYPD has a "No filming Policy" and that policy is a content neutral reasonable time, place and manner restriction and is therefore constitutional. Second circuit case law makes it clear that the vestibules of the precincts of the NYPD are a limited public forum where the public is granted entry for a specific purpose, the discussion of public safety. Therefore, any restrictions on expression, such as a no filming policy, need only be reasonable and viewpoint neutral.

**I.   NYPD Lobbies are Limited Public Forums**

111.    The Second Circuit has identified four factors that courts should use when evaluating the nature of a particular property or space (i) whether the property falls within those categories of property historically deems to be traditional public fora, (ii) whether it is the type of property that should be so classified given its physical characteristics, (iii) the objective way it is used, and (iv) the government's intent in constructing and opening it to the public. *See Price v City of New York,* 2018 US Dist. LEXIS 105815, 29 (S.D.N.Y 2018); *quoting Hotel Emples. & Rest Emples Union, Local 100 v. City of N.Y. Dep't of Parks and Rec., 311 F.3d 534 (2d Cir. 2002) (internal quotations removed).* Moreover, "the Second Circuit has repeatedly recognized that the "primary factor" in a forum analysis is the manner in which the public space is used." *Id.* at 29.

**II. Police Precincts are a Space Primarily Used for Public Safety.**

112.         The objective use of a police stationhouse has been described by the Kings County Criminal Court as "an area used by law enforcement officials in order to ensure the public safety, and by other citizens who seek to give or obtain information about public safety." *See People v Reape,* 22 Misc. 3d 615, 618 (Crim Ct, Kings County). The decision in *Reape* also

describes the ability of a government to regulate the use of a municipal or state property that is generally open to the public, where the license to enter and use the space may by regulated so as to prevent interference with the ordinary use of the property by other members of the public with an equal right of access to it. The critical question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Although members of the public are permitted to enter and exercise their First Amendment Rights, the forum's purpose is to ensure the public safety.

113.    Because the primary purpose of a Police Precinct and its lobby is to ensure public safety, it is within the NYPD's jurisdiction to regulate the exercise of the First Amendment to ensure the purpose of the forum is met. *See Make the Rd. by Walking, Inc. v Turner, 378 F.3d 133, 146 (2nd Cir. 2004)* (Welfare office waiting rooms were limited public fora open to discussion of welfare issues by virtue of the fact that welfare recipients waited in them). A bulletin, published by the NYPD Legal Bureau states that, "Due to the sensitive nature of what occurs inside police stationhouses, law enforcement agencies can limit expressive activities within the confines of a stationhouse in order to uphold the sanctity of investigations, protect witnesses, and allow officers to perform essential functions without interference." See Exhibit C.

114.    This makes it clear what the goals of the NYPD in allowing for a lobby that is open to the to the public. The NYPD seeks to engage the public and allow them free access for the purpose of public safety. But more than just allowing the public to enter, the City has shown the intent to ensure that victims of crimes enjoy a "freedom from intimidation, threats or harassment." *See* NYS Executive Law Article 23, Fair Treatment Standards for Crime Victims.

115.    A police precinct cannot be said to be a property which is traditionally public. Such traditionally public fora are "places such as streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens, and discussing questions." *See Make the Rd. by Walking, Inc. v Turner, 378 F.3d at 142*. Moreover, a stationhouse cannot be said to have the physical characteristics of such a traditionally public forum. A police precinct is an enclosed structure which houses many police officers to engage the public in the reporting of crime; it also is the workspace for handling many of the practical necessities of employing a modern police force. Many features of a stationhouse, such as muster rooms, locker rooms, offices, computers, secured weapons, docks for body worn cameras, control apparatus for officer court appearances, set them apart from a traditionally public forum.

116. It cannot be disputed that police precincts, pursuant to forum analysis, are in fact, limited public fora. To that end, inside a limited public forum, the government is able to restrict speech outside of the discussion of certain subjects. Outside of those subjects for which the fora are intended, "restrictions need only be viewpoint neutral and reasonable." *See Silberberg v. Bd. Of Elections of N.Y.*, 272 F. Supp 3d 454, 468 (S.D.N.Y. 2017).

117. The blanket prohibition of recording in the Administrative Guide is permitted because it is viewpoint neutral and reasonable. No viewpoint is articulated in the restriction; the restraint applies to all recording. Additionally, the measure is reasonable because there is no more narrowly tailored language that can be substituted. As set forth above, the presence of a variety of individuals, and communications and/or information, in the vestibule of a police stationhouse cannot be anticipated. Moreover, the protection of those within the stationhouse and otherwise demands that recording be prohibited.

118. In this case, it is clear that the defendant did not enter the Police Precinct for the purpose of public safety. The defendant entered holding a handheld camera and microphone while being followed by someone else who was also filming. The defendant does not state any official business or that he is seeking to give or obtain any information relating to public safety. He gives

the officers no indication that he had any legitimate purpose for being in the precinct lobby. In fact, you can tell from the video published by the defendant that the defendant had no legitimate purpose to be in the precinct. In the video published on YouTube, the defendant is filming for a few blocks before entering the precinct, as he gets to the doors of the precinct he states, "we're going in together, we're going to affect change together." He fails to articulate, any real purpose for being in the Precinct other than creating a video. The first thing the defendant says to an officer at the door is "Can I have your name and badge number." Here again we see that the defendant is making it clear to both the viewers of the video and the officers at the scene that he has no legitimate purpose for being in the Precinct.  The defendant has multiple opportunities to state what his purpose for being in the Precinct is to officers and he fails to do so. In fact, he repeatedly tells officers that he is "going inside where [he] has the right to record" making it clear again to officers that the defendants ONLY purpose for being in the precinct is to film.

119.    The defendant's only purpose for being in the Precinct was to create a reaction to his filming. Therefore, Plaintiff's First Amendment Right to Free Press may be restricted in a viewpoint-neutral and reasonable manner. No viewpoint is expressed in the restriction and the prohibition is reasonable. Due to the unpredictable interactions with the public on who would enter a precinct at any time, the prohibition cannot be narrowed. The protection of victims, informants, or undercover officers must be upheld to maintain investigations and to continue to encourage public engagement.

120.    Defense is also incorrect that a restriction on cameras in the Precinct lobby is a "blanket" prohibition on First Amendment activity. This restriction does not prevent defendant from entering the police Precinct with a pen and paper and writing down what he observes while he files a complaint. Defendant also has the option to contact an NYPD Public Information Officer to schedule a meeting to discuss department policies, procedures, and efforts to safeguard

constitutional freedoms, which the defendant can later broadcast on his YouTube channel without restriction.[9] While this approach may not be as profitable (or as contentious) as defendant prefers, it is still First Amendment activity he may engage in to obtain the same information (and express the same message) that he would if he walked into the Precinct lobby with a camera.

121.     Defendant notes that NYPD uses Body Worn Cameras and surveillance cameras at the location and draws a cynical analogy to the defendant's behavior however there are clear and obvious differences. Those recordings in possession of the NYPD are necessary elements to insure the documentation of criminal investigations and the safety of the precinct. There are a myriad of statutes and regulations to insure that this information is safeguarded and properly used. Footage can be reviewed for potentially compromising information before being published and even then only as required by statute. Recordings from NYPD cameras are still discoverable, either by statute or subpoena, and can be requested by the Freedom of Information statues. But in those circumstances, compromising information can be redacted from the recording before being released to the public. The "what-aboutism" argument fails here as it does in most contexts.

**B.   THE NYPD'S NO FILMING POLICY DOES NOT VIOLATE CAPA.**

122.     Under the City Administrative Procedure Act of New York City ("CAPA"), a rule is defined as "any statement or communication of general applicability that (i) implements or applies law or policy or (ii) prescribes the procedural requirements of an agency including an amendment, suspension, or repeal of any such statement or communication." *See* New York City Charter § 1041(5).  A "Rule shall include but not be limited to, any statement or communication which prescribes (i) standards which, if violated, may result in a sanction or penalty." *See* NY City Charter § 1041(5)(a). A Rule shall not include any (i) statement or communication which relates

---

[9] The NYPD has a website prepared for these inquiries from the public:
https://www.nyc.gov/site/nypd/bureaus/administrative/public-information.page.

only to the internal management or personnel of an agency which does not materially affect the rights of or procedures available to the public." *See* NY City Charter § 1041(5)(b).

123.    The NYPD Administrative Guide states, "members of the service may order any member of the public who is photographing or recording within Department facilities to stop such activity," and, "(I)f such person refuses to stop, they then should be ordered to leave the premises." *See* Exhibit -- Administrative Guide 304-21(7). The Administrative Guide details an escalating set of procedures to address the limited cause of regulating the vestibule of the police precinct. The Guide does not create a "standard which, if violated, may result in a sanction or penalty." *See* NY City Charter at 1041(5)(a). Rather, the Guide articulates a course of action to be taken by officers in order to ensure the safety of the officers in the precinct as well as the privacy of public as they pursue services within the precinct. The Administrative Guide articulates possible outcomes of an interaction between a member of the public who is recording and a member of the NYPD. The Guide does not require arrest and prosecution as the mandate. The circumstances as viewed by individual members of the NYPD play a role in the action to be taken. The Appellate Division, First Department has held:

124.    "The rulemaking process is mandated when an agency establishes precepts that remove its discretion by dictating specific results in particular circumstances. Only a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation." *See Matter of DeJesus v Roberts,* 296 A.D.2d 307, 309 (2d Dep 2002).

125.    The decision in *Matter of DeJesus* referred to Court of Appeals caselaw which articulated a similar opinion applied to the New York State Administrative Procedure Act, which is substantially similar to the NYC CAPA rulemaking definitions. *See* NY CLS St Admin P Act § 102(2) & NYC Charter § 1041(5). Rulemaking process is required for speed limits, the method of

service for a suspension for an infraction, and the manner in which overpayments of unemployment benefits must be recouped. *See Alca Indus. v Delaney,* 92 N.Y.2d 775, 778-9 (1999); *quoting People v Cull*, 10 NY2d 123 (1961), *Matter of Cordero v Corbisiero, 8*0 NY2d 771 (1992), *Matter of Schwartfigure v Hartnett,* 83 NY2d 296 (1994). "In contract, agency penalty guidelines that vest inspectors with significant discretion, and allow for flexibility in the imposition of penalties, all with the view of imposing the appropriate sanction for the individual offense and offender in the particular case are not rules under the State Administrative Procedure Act or the New York Constitution." *Alca Indus. v Delaney,* 92 N.Y.2d at 78-9.

126. Therefore, the NYPD Administrative Guide 304-21 is not a rule under the CAPA definition. Rather, the Guide calls for a course of interaction with a member of the public. Based on the circumstances of that interaction, as judged by the individual officer, a penalty may or may not be applied.

127. In the instant case, Plaintiff entered the 75th Precinct already recording video. The first officer the defendant encountered informed him of the ban on filming, Additional officers then responded to the lobby and ordered the defendant to stop filming. The defendant refused to film and continued to stay in the lobby despite orders to leave. Officers then escorted the defendant out of the lobby and instructed him not to come back in. It was only after the defendant re-entered and disobeyed multiple orders to leave that the officers made the decision to arrest the defendant. We see on this interaction that the guide does not establish a rule for what must happen but simply guides on an officers as to what actions they can take based on what they think is appropriate. If the guide was a strict rule, the officers would have had no choice but to arrest the defendant as soon as he initially refused to leave.

128. In the alternative, the Administrative Guide Procedure does not meet the definition of a procedure which requires formal rulemaking under CAPA. As articulated above, a rule

includes any statement or communication which prescribes standards which, if violated, may result in a sanction or penalty. *See* NY City Charter § 1041(5)(a). However, the Administrative Guide states a course of action for members of the NYPD to take when confronting individuals who are recoding in the vestibule of stationhouses. The instruction, the purpose of which is to manage the interior of a limited public forum, is to request and individual to leave the vestibule or stop recording. This request is not a penalty, and the NYPD is then acting as an administrator of a limited public property and revoking the license for such individual to be present.

## C.  THE NYPD's NO FILMING POLICY DOES NOT CONFLICT WITH THE NYC RIGHT TO RECORD ACT OR THE RIGHT TO MONITOR ACT.

129.    Defense argues that the NYPD's no filming policy conflicts with the NYC Right to Record Act (RTRA) and the NY State Right to Monitor Act (RTMA). The RTRA states "A person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity." The RTMA states that a "person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity and to maintain custody and control of that recording and of any property or instruments used by that person to record law enforcement activities".

130.    The plain text of both acts makes it clear, that these acts give People the right to record law enforcement activities. These laws were passed in the spirit of transparency, to ensure that people who wished to film an arrest or a search, could do so without being arrested, threatened or intimidated. However, nothing in the text of either act indicates that this right is absolute and not subject to any restrictions or that such a right supersedes other existing restrictions. To assume

that the legislatures intended for these acts to give People the right to film in any place and any circumstances would be absurd.

131.     Neither act specifically list any exceptions or carve outs relating to specific locations. For example, nowhere in the body of the Right to Record Act does it say that civilians can't record police officers inside a hospital emergency room, or inside a domestic violence shelter. But the legislature clearly did not intend for this act to completely supersede the rules and regulations of those institutions. The defense points out that, whenever a statute contains a "carefully worded and enumerated exception []" to a general rule, it suggests 'that the Legislature intended the statute's reach to be… limited to its precise terms' *People v Ayala*, 75 NY2d 422, 429 (1990). The doctrine of *expressio unius est exclusio alterius* suggests that additional exceptions should not be implied. *See Colon v Martin*, 35 NY3d 75, 81 (2020)."

132.     However, in making this argument the defense fails to point out that within the RTRA and RTMA there are not **ANY** time/place/manner exceptions enumerated. The fact that the legislature did NOT carefully enumerate the specific exceptions implies that they did not intend for these acts to be the only rule that applies to the filming of police activity.

133.     There are a number of institutions, within the city that due to their nature-filming may be prohibited. Domestic violence centers, shelters, medical facilities and clinics, museums and theaters, there is nothing in the language of the right to record act which makes it appear that the mere presence or police officers means that any rule regarding filming inside a specific location is automatically overruled. That is because, the legislature clearly did not intend for this act to be the final word in when and where filming is prohibited. If the legislature had intended to create a law that overruled all over regulations regarding filming, then they would have gone through and listed out the specific exceptions. The fact that they did not, shows that they intended for this law to interact with the other rules and regulations that exist in the city, not overrule them.

134.    The Defense will likely try and differentiate these other locations/organizations from the NYPD by pointing out that this regulation was directed at the NYPD themselves. However, even when we just consider the NYPD, the idea that this law was meant to override all other rules and regulations created by the NYPD about where filming is permitted is absurd.  Was this law meant to override any rules that the NYPD has about filming in holding cells? was it meant overrule laws about who could film interviews with witnesses? was it meant to overrule whether defendants or their attorneys can record interviews? Are defendants now free to record proffer interviews with the DA's office? Clearly the legislature did not intend for the act to completely remove from the NYPD to any ability to regulate where filming is permitted.

135.    The Court of Appeals provides guidance when confronting statutory interpretation of seemingly incompatible laws. First the legislative intent must be examined and then, "the language must be analyzed in context and the related provisions must be harmonized and rendered compatible." People v. Schneider, 37 NY2d 187, 196 (2021). When interpreting statutes that may appear contradictory Courts must be, "governed by the principle that we must interpret a statute so as to avoid an unreasonable or absurd application of the law." People v. Garson, 6 NY3d 604, 614 (2006).

136.    Here there is no real incompatibility between these laws and existing laws unless the statute is read to produce absurd results. By counsel's argument the statute permits recording in any and all scenarios and above all other restrictions, legal or otherwise. The omission of restrictive language on the right to record does not grant carte blanche to bypass existing legal frameworks, be they civil, regulatory, or criminal in nature. These laws were meant to provide the public with a general license to film police activity in both public areas where filming is permitted as well as in private/personal areas where police enter.  These laws were not meant to supersede or overrule the ability of organizations and institutions to control what level of filming is permitted

inside their own facilities and premises. This law was not meant to give people the right to film in police in areas where filming is restricted. For example, it would be absurd to assume that civilians now have the right to film in the emergency room when a patient is being escorted by a police officer or that members of the grand jury now have the right to take out their phones and start recording the moment a police officers walks into a proceeding. Have these statutes by one stroke rendered thousands of other statutes and regulations invalid? Certainly not.

137.   If Defense's argument were to be accepted, it means that this one law was meant to overrule a litany of regulations and requirements promulgated by a variety of institutions meant to enhance safety and privacy. It would mean that Courts would no longer be able to keep cameras out of court rooms, that domestic violence shelters would no longer be allowed to prevent the filming of their intake, and that hospitals would have no ability to restrict the filming of patients or medical procedures when the patient is being escorted by a police officer. By defendant's interpretation one would be permitted to walk into any secure facility such as a jail, crime scene or even the Judge's chambers to film police officers. That was clearly not the purpose of this law.

138.   These laws were not meant to provide an absolute right to film the police, like almost every enumerated right, the right to film the police, provided with the RTRA and RTMA, is meant to be balanced against the compelling needs of police, courts, hospitals and other institutions to provide safety and privacy. Not allowing the NYPD, an organization tasked with both ensuring safety as well as some degree of privacy to victims, witnesses, informants and defendants, to establish rules about who can film inside their own facilities would fly in the face of public policy.

139.   We can tell that transparency laws are not meant to supersede all needs for discretion and public safety when we look at the rules regulating BWC usage. Generally, officers are required to turn on their BWC when interacting with civilians and potential

suspects/defendants. This was a law passed in the spirit of transparency and accountability. However even those regulations acknowledge that in many situations the desire to record what is happening for the sake of transparency is outweighed by other factors which is why Officers are required/permitted to turn their BWC off when entering a hospital, when speaking to a Confidential informant, when testifying in court, when interviewing a victim of domestic violence.

140.     When creating this act, the legislature did not intend to create a law that completely superseded the ability of organizations, locations and even the NYPD to regulate who can film and where. This rule and is obviously meant to empower the public to feel comfortable filming the police in situations in which filming is permitted and co-exist with rules that regulate when and where filming in general can occur. As of this moment, there is no controlling authority which establishes that the RTRA or RTMA was intended to overrule the NYPD's policy on filming within their own precinct.

### III. FEDERAL COURT DECISION HAS NO BEARING ON THIS CASE

141.     A preliminary injunction against the NYPD's no filming policy was issued by a Federal Court on November 2nd, 2023, by the Hon. Jessica G. L. Clarke in SDNY under 23-CV-6369, which is attached hereto.  (See Exhibit D). That action was brought by the defendant in Federal Court to enjoin the NYPD's enforcement of its policy of preventing filming in the lobbies of precincts. This court should not consider that court's determination as having any bearing on this pending matter.

142.     First, the federal decision is irrelevant because defendant asserted to the court that any determination on their federal matter would have no bearing on the pending criminal action. The *Younger* doctrine prohibits federal courts, "from taking jurisdiction over federal constitutional claims that involve or call into question state proceedings." *Diamond "D" Const. Corp. V. McGowan*, 282 F3d 191, 198 (2d Cir. 2002). The defendant's own memorandum of law in that

case makes explicit that this criminal matter will not be impacted by any federal relief on this issue. Relying on such assertion, the Federal Court entertained defendant's motion. To bootstrap this decision to this case would circularly allow the Federal Court to bypass the *Younger* doctrine and simultaneously subject this court to Federal jurisdiction.

143.    That decision was only a temporary injunction and that none of the issues presented in that case were decided on the merits. The federal court simply made a ruling that they believe the plaintiffs are *"likely"* to succeed on a claim under the Right to Record Act. It would be inappropriate for a state criminal court to adopt the findings of a federal civil case especially when the issues before the federal court have not been fully litigated. As discussed in detail throughout this motion response the People disagree with the holding of that court and urge an independent and reasonable view of the matter pending.

144.    Furthermore, it is well established that, "a lower **federal** court's finding is **persuasive** but not **binding** on a lower state court as "both sets of courts are governed by the same reviewing authority of the Supreme Court." *People v. Battease,* 74 A.D.3d 1571 (3rd Dep. 2010); *See also People v. Johnson,* 65 Misc.3d 1024 (City Court, City of Rome 2019) (upholding NY's prohibition of stun guns despite a federal case declaring the statute unconstitutional under *Heller, Avitabile v. Beach,* 368 F. Supp.3d 404 [NDNY 2019]). There is no reason for the state court to adopt the findings of a non-binding, persuasive authority, especially when the issues in front of that persuasive authority have not been fully litigated yet.

145.    Furthermore, if a court were to adopt any of the findings of the Federal Court, it would be much more appropriate for the State Court to adopt the Federal Courts findings regarding 1st Amendment issues (the court found that the NYPD's no filming policy was not a violation of the 1st Amendment) not the findings regarding a local city law. Ultimately their decision hinged

on the belief that the RTRA and RTMA trumped any existing statutes which we believe is wrongly decided and have discussed extensively *supra*.

## IV. MOTION TO INSPECT PHOTOGRAPH AND MEASURE THE ALLEGED CRIME SCENE OR PREMISES

146.    Counsel requests pursuant to CPL § 245.30(2) for an order to permit the defendant "reasonable access to inspect, photograph, or measure such crime scene or premises." The People maintain that the defendant does not meet the requirements to necessitate such an inspection without additional information. The People do not speak for the New York Police Department and they are by statute a party to this request. Before any decision is to be made on this request, the People request that this court provide an opportunity for NYPD to be present and to relay their concerns regarding this request. Additionally, any order produced by this court to permit such an inspection should 1) exclude the defendant from performing the inspection, 2) prevent those permitted entry from distributing any photos or recordings gathered as a result of the inspection, 3) prevent any livestreaming or broadcast recordings of the inspection and 4) provide specific limitations on the amount of time and manner in which this inspection may occur.

147.    The reasons for our request that such reasonable restrictions be placed on the execution of the Judge's order are readily apparent from the defendant's social media profiles and the facts of this case. Defendant is keen to monetize any portion of this criminal action and these requests are necessary to ensure that the criminal statutes of disclosure are used to provide defendant with adequate opportunity to prepare their defense, but not adequate opportunity to develop footage for sale. The defendant in this case has posted online updates about the progress of this case as well as the aforementioned civil action in Federal court related to this issue. In fact, mere days ago the defendant visited the 75th Precinct and was present inside the lobby of the Precinct to generate a video of himself telling the precinct of the injunction addressed *supra*. The

defendant had an opportunity to view an open space and take measurements, but instead they recorded a video to post on their website. That video has generated over 300,000 views since its live stream five days ago.

## V.  CONCLUSION:

148.    This motion is based in the fact that the defendant disagrees with the NYPD's No filming policy. Within their motion to dismiss the defense argued why this policy was unlawful, and the People have presented their defense of the policy. However, the case presently in front of the court is a trespass case. Whatever the Courts decision on the validity of the NYPD's no filming policy, that does not change the fact that the policy was in place on the date at issue. The defendant entered a building where a policy was in place, the defendant violated that policy, was informed that he violated that policy, refused to leave and then returned after his license to leave was revoked. Those facts which are clearly laid out in the accusatory instrument, make out trespass, criminal trespass, and OGA.  The defendant's opinion on a policy does not give them the right to violate that policy. The defendant in this case disobeyed orders given by NYPD officers who had a good faith belief that there was a valid policy in place, the defendant re-entered the precinct after someone with authority and a legitimate basis instructed them to leave. That is a trespass.

WHEREFORE, for the reasons stated herein, the People respectfully request that this Court deny defendant's motions and for other relief as dictated by the interests of justice.

DATED: Brooklyn, New York

November 9, 2023

Respectfully Submitted,


Eric Gonzalez
Kings County District Attorney
350 Jay Street
Brooklyn, New York 11201


_James Hamilton_

James Hamilton
Assistant District Attorney