O8DAReyO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SEAN PAUL REYES,

4                  Plaintiff,

5           v.                              23 Civ. 6369 (JGLC)

6  THE CITY OF NEW YORK,
                                            Oral Argument
7
                  Defendant.
8
   ------------------------------x
9                                           New York, N.Y.
                                            August 13, 2024
10                                          10:02 a.m.

11 Before:

12                 HON. JESSICA G.L. CLARKE,

13                                          District Judge

14                        APPEARANCES

15 LATINOJUSTICE PRLDEF
        Attorneys for Plaintiff
16 BY:  MEENA ROLDÁN OBERDICK
        ANDREW CLAUDE CASE
17
18 NEW YORK CITY LAW DEPARTMENT
        Attorneys for Defendant
19 BY:  MARK DAVID ZUCKERMAN

20

21

22

23

24

25

O8DAReyO

```
 1          (Case called)
 2          THE COURT:  We are here in Reyes v. City of New York
 3   for an oral argument on defendant's motion to dismiss the first
 4   amended complaint.
 5          Counsel, please state your appearances for the record
 6   starting with the plaintiff.
 7          MS. OBERDICK:  Good morning, your Honor.  Meena Roldán
 8   Oberdick with LatinoJustice PRLDEF for plaintiff Sean Paul
 9   Reyes, and I'm accompanied by my colleague Andrew Case.
10          THE COURT:  Good morning.  And for the city?
11          MR. ZUCKERMAN:  Good morning, your Honor.  Mark
12   Zuckerman for the defendant City of New York.
13          THE COURT:  Good morning.  So I'm going to first hear
14   from counsel for defendant and then hear from counsel for
15   plaintiff.  I anticipate limiting this to about 20 minutes per
16   side, but we'll see how things go.
17          So, Mr. Zuckerman, I'll start with you.
18          MR. ZUCKERMAN:  Thank you, your Honor.
19          May it please the Court.  My name is Mark Zuckerman,
20   Office of the Cooperation Counsel for defendant City of New
21   York.
22          As your Honor is aware, the city has moved to dismiss
23   plaintiff's amended complaint in its entirety.  Plaintiff's
24   amended complaint contains six causes of action.  Each of them
25   should be dismissed upon the city's motion.  Plaintiff first
```

O8DAReyO

brings a claim under the First Amendment.  Plaintiff contends

that he has a First Amendment interest in recording in NYPD

precinct lobbies, which are open to the public.

In deciding plaintiff's application for a preliminary

injunction, the Court ruled that plaintiff had not demonstrated

a likelihood of success on this claim.  The Court correctly

applied the forum analysis as set forth in United States

Supreme Court's decision in *Cornelius* and its progeny, which

analyzes First Amendment activity restrictions on government

properties.

NYPD precinct lobbies are nonpublic fora.  This is

clear from the video of the subject incident where plaintiff

incorporated by reference to his amended complaint.  NYPD

precinct lobbies are not set up for expressive activities nor

is that their intended use.  NYPD precinct lobbies are set up

for the NYPD business that is conducted in such locations.

Members of the public are able to file complaints and

police reports.  Members of the public are able to talk to

police officers and detectives.  Members of the public are able

to obtain police reports.  Domestic violence victims are able

to meet with police officers and detectives.  Individuals are

able to discuss the possibility of becoming confidential

informants.

NYPD precinct lobbies are not set up for expressive

activities or for public debate.  That's not their intended

O8DAReyO

1    use.  NYPD precinct lobbies are therefore nonpublic fora.

2           THE COURT:  Mr. Zuckerman, let me ask you about the

3    cases that plaintiff cites that they say stand for the

4    proposition that I should not conduct a forum analysis, and

5    that instead, it should be based on intermediate scrutiny and

6    that's the standard that I should apply.  And I looked at one

7    of their cases, *Price v. Garland* and the analysis there as to

8    why a forum analysis shouldn't be conducted.  What's your

9    response?  Why should I not consider the reasoning in *Price v.*

10   *Garland*?

11          MR. ZUCKERMAN:  Well, actually, I mean, *Price* applied

12   a reasonableness test to filming in a public park I believe.

13   So actually *Price* applied a lesser degree of heightened

14   scrutiny, a lesser degree of scrutiny than the forum analysis.

15          THE COURT:  I agree with you on that, but on the first

16   part *Price* -- the Court went through the analysis of, and then

17   determined that a forum analysis is essentially irrelevant, and

18   then just applied the reasonableness standard.  So you disagree

19   with that first part I assume?

20          MR. ZUCKERMAN:  Right.  Because, I mean, the United

21   States Supreme Court and the Second Circuit Court of Appeals

22   has never applied heightened scrutiny to a right to record of

23   any sort or information gathering.  So they're just not United

24   States Supreme Court precedent or Second Circuit precedent for

25   that proposition.  And the out-of-state circuit courts, they've

O8DAReyO

```
1    applied, most of them, have applied the forum analysis that

2    I've gone through so far here today.  And concluded that under

3    reasonableness standard, a restriction on recording is okay.

4    So there just isn't a precedent for what plaintiffs are

5    contending.

6              The restriction that plaintiff challenges,

7    restrictions on recording in NYPD precincts is reasonable and

8    content neutral.  It therefore passes Constitutional muster.

9    The first important thing to note is that the restriction on

10   recording in NYPD precinct lobbies is just one aspect of the

11   subject NYPD policy on the recording of police activities.  It

12   was part of a settlement of a lawsuit which included a new NYPD

13   patrol guide that allows members of the public to record police

14   officers' activities in traditional public areas, such as

15   streets and sidewalks as well as inside private buildings where

16   individuals have the right to be present.

17             THE COURT:  Was that settlement before the right to

18   record was --

19             MR. ZUCKERMAN:  Yes, it was.  It was in the *Rubicon*

20   case, which was 2018.

21             So the patrol guide provision that was promulgated as

22   part of that preceded the Right to Record Acts by approximately

23   two years.

24             So it was not a blanket restriction on the recording

25   of police officers as they undertake their policing activities
```

O8DAReyO

 1    as plaintiff contends.  It is just the opposite.

 2           The second aspect of this is that the restriction

 3    ensures that NYPD precinct lobbies are able to be used for

 4    their intended purpose, the police business that I've already

 5    described here today.  Individuals who go to NYPD precincts are

 6    likely not going there with the expectation that they are going

 7    to be recorded by plaintiff.  They may not want that.  And that

 8    might lead to confrontations with plaintiff that the NYPD would

 9    have to referee.  Individuals may want to keep their

10    transactions private.  And there are security concerns that

11    justify this restriction as well.

12           Plaintiff's own subject video shows that.  He video

13    recorded a security keypad on the entry to the private area of

14    the precinct as a police sergeant entered a security code on a

15    keypad.  He video recorded a fixed security camera in the

16    precinct lobby.  He also video recorded private areas of the

17    precinct from the precinct lobby.  The stated purpose of his

18    recordings is to post them online.  That's what he does.  That

19    presents security, privacy, and safety concerns.  The NYPD

20    policy is therefore reasonable as a matter of law.

21           The policy is also content neutral.  The policy may be

22    enforced against anyone recording in an NYPD precinct

23    regardless of content.  The policy does not address any

24    particular content at all.  The policy is therefore content

25    neutral and passes Constitutional muster as a matter of law.

1    It does not violate the First Amendment under a forum analysis.

2          So plaintiff knows that the forum analysis defeats his

3    First Amendment claim.  As your Honor already referred to, he

4    is now trying something else.  Now he claims that recording an

5    NYPD precinct is really not expressive activity, but rather

6    should be analyzed as information gathering or recording under

7    heightened Constitutional standards.  As I've already

8    discussed, he does not cite to any United States Supreme Court

9    or Second Circuit decision that supports his conclusion, nor

10   could he.

11         Under the Second Circuit authority, *the City of*

12   *Yonkers* case, recording in courtrooms was analyzed under a

13   reasonableness standard.  The Second Circuit did not apply a

14   heightened scrutiny standard to recording in a nonpublic forum.

15   The Third Circuit in the *Whiteland Woods* case noted that the

16   Second Circuit in *City of Yonkers* had evaluated the ban on

17   recording in courtrooms using criteria similar to expressive

18   speech in a nonpublic forum.

19         As we have set forth in our briefing, most

20   out-of-circuit Court of Appeals decisions analyzing recording

21   or information gathering did not apply a heightened scrutiny, a

22   heightened level of scrutiny, to restrictions on recording or

23   information gathering in nonpublic fora and did apply the forum

24   analysis.

25         So there's hardly consensus, as plaintiff contends, of

O8DAReyO

1   out-of-circuit Court of Appeals to apply heightened scrutiny to

2   the recording of police officers in nonpublic fora.   So

3   plaintiff's First Amendment claims should be dismissed.

4          Briefly, plaintiff also brings a First Amendment

5   retaliation claim.   As the Court found in deciding the

6   preliminary injunction issue, it is required that plaintiff

7   demonstrate a protected First Amendment interest to succeed on

8   this claim.   But as just seen, he can't.   So plaintiff's First

9   Amendment retaliation claim fails as a matter of law as well.

10          I'd like to now discuss the Fourth Amendment Monell

11   claim.   Plaintiff claims that his Fourth Amendment rights were

12   violated.   This claim is new.   It was not brought in his

13   original complaint.   It is only brought in desperate attempt by

14   plaintiff to convince the Court to keep jurisdiction over this

15   case, but the claim fails for a number of reasons.

16          First, even if plaintiff is ultimately correct, which

17   he isn't, that the state and city Right to Record Acts grant

18   him the right to record in NYPD precinct lobbies, that does not

19   amount to a Fourth Amendment violation.   This isn't a situation

20   where there's an issue of whether or not there's probable cause

21   under the New York State Penal Code in order to determine if

22   there's a Fourth Amendment violation or not.   Plaintiff's claim

23   is that the state and city Right to Record Acts override the

24   New York Penal Code.   So this is a pure state law --

25          THE COURT:   Well, why is that?   So your argument is

O8DAReyO

1    that, just say you agree that the Right to Record Act permits

2    plaintiff to record here in police precincts, and say a person

3    was arrested solely for recording in a police precinct after

4    they were unlawfully told they can't record there.  You're

5    saying that that does not amount to a Fourth Amendment

6    violation?

7              MR. ZUCKERMAN:  Yes, correct, your Honor.

8              THE COURT:  And why is that?

9              MR. ZUCKERMAN:  Because the basis, the basis of

10   plaintiff's argument is that the state and city Right to Record

11   Acts override the Penal Code.  So that's a pure state law

12   issue.  That's not a Fourth Amendment issue.

13             THE COURT:  Well, if there's no probable cause for the

14   officer to arrest the person, then isn't that a Fourth

15   Amendment violation?

16             MR. ZUCKERMAN:  Yes.  But that's not what plaintiffs

17   are arguing.  They're arguing that there's a creature of state

18   or city law that overrides the Penal Code.  So that's a pure

19   state or local law issue, not a Fourth Amendment issue.

20             Second, the Right to Record Acts do not grant

21   plaintiff the right to record in NYPD precinct lobbies.  We

22   have cited law from the New York Court of Appeals that to

23   override the common law right of proprietorship that the NYPD

24   enjoys, there must be a clear and specific intent of the

25   legislature to do so.  That did not happen here.  The Right to

O8DAReyO

| 1  | Record Acts are completely silent as to where recording of law |
| 2  | enforcement officers may take place. |

3          Plaintiff's interpretation of the Right to Record Acts

4  would also lead to absurd results, which New York law is clear

5  must be avoided.  Under plaintiff's interpretation of the Right

6  to Record Acts, he could record in the private areas of police

7  precincts, he could record in courthouses, private residences,

8  prisons, and hospitals.  That obviously was not the intent of

9  the Right to Record Acts.  There must be some limit on where

10  plaintiff can record.

11          New York courts allow this Court to look at the

12  legislative intent on where plaintiff can record.  In our

13  briefing, we have cited to numerous portions of the legislative

14  histories behind the Right to Record Acts, which demonstrate

15  that the purpose of the Right to Record Acts was to codify the

16  right to record in traditional public places like streets,

17  sidewalks, and parks.

18          THE COURT:  Do you agree that I should only look to

19  legislative history if the statute is ambiguous?

20          MR. ZUCKERMAN:  No.  No.  What we would argue is that

21  the location where someone can record, that the acts are only

22  clear in the most stratospheric sense.  The contours of where

23  someone can record, the acts are completely silent on that.

24          THE COURT:  So you're saying that part is ambiguous?

25          MR. ZUCKERMAN:  No, we're not saying it's ambiguous.

O8DAReyO

1    We're saying that it's -- the contours of where a person can

2    record is not clear.

3            So the right to record, the legislative histories

4    indicate that there wasn't an intent to create a new right,

5    just to codify a right that already existed.  Plaintiff does

6    not refute the legislative histories that we provided, nor

7    could he.  Instead, he cites to a quote from Donovan Richards

8    that he claimed was made a part of the legislative history of

9    the city Right to Record Act, but it wasn't.  As we pointed out

10   in our reply brief, the quote from Donovan Richards was from a

11   newspaper article.  And the *post hoc* affidavit from Jumaane

12   Williams not referenced in the amended complaint should not

13   change the outcome either.  At the time that the city right to

14   record was introduced, Mr. Williams stated in the record that

15   the intent of the city Right to Record Act was not to add a new

16   right.

17           So the Court should examine the legislative histories

18   that we presented, and it's clear there was no legislative

19   intent to grant a right to record in police precinct lobbies.

20           Plaintiff hasn't brought a claim against the city

21   based upon its enforcement of the trespass laws independent of

22   the Right to Record Acts.

23           In any event, as seeing there was no specific or clear

24   intent to override the New York trespass laws or the NYPD's

25   common law rights as proprietor.  Plaintiff even concedes that

O8DAReyO

1    the trespass laws address this issue, even if they don't agree

2    with the outcome of the analysis, that we believe ought to be

3    reached.

4        In any event, in the circumstance, plaintiff's

5    Constitutional rights were not violated by virtue of the

6    enforcement of the trespass laws, because as seen in light of

7    the intended uses of precinct lobbies and conducting a forum

8    analysis, plaintiff's First Amendment rights were not violated,

9    nor were statutory rights violated either because the Court

10   should analyze this issue in light of whether plaintiff's

11   interpretation would lead to absurd results and the legislative

12   histories of the acts that I've already discussed.  Recording

13   in police precinct lobbies is not consistent with their

14   intended uses.

15       Under any of these tests, in order for plaintiff to

16   leave -- under any of these tests, the order for plaintiff to

17   leave the 61st Precinct when he was recording was lawful under

18   state common law.

19       Third, there was probable cause for plaintiff's

20   subject arrest at the 61st Precinct.  As seen, he did

21   physically interfere with the official functions being

22   conducted by the office --

23       THE COURT:  Was that based on what is asserted in the

24   complaint or are you looking beyond what's -- is that based on

25   what's in the video, which is outside of the scope of what's

O8DAReyO

1   alleged in the complaint?  And, if so, can I consider that?

2              MR. ZUCKERMAN:  Yes, your Honor, it is based upon the

3   video.  The video, we would argue, is incorporated by reference

4   into the complaint.  And a video that's incorporated by

5   reference into the complaint can be considered by the Court on

6   a motion to dismiss.

7              THE COURT:  Can you turn to -- I'm just being mindful

8   of time.

9              MR. ZUCKERMAN:  Yeah.

10             THE COURT:  Can you turn to the Younger argument that

11  you made?

12             MR. ZUCKERMAN:  Sure.  Sure.

13             Younger Abstention Doctrine does apply to plaintiff's

14  newly added declaratory relief claim.  Plaintiff's declaratory

15  relief claim should be dismissed as it interferes with the

16  ongoing criminal proceeding.

17             Although the prosecution arising out of plaintiff's

18  75th Precinct arrest was dismissed, the people have appealed

19  the dismissal, so the criminal prosecution is still pending.

20             Plaintiff seeks a declaration that he can record in

21  NYPD precinct lobbies based on Right to Record Act, which is

22  the exact defense he has raised in the criminal proceedings.

23  So the declaration that plaintiff seeks would interfere with

24  the ongoing criminal proceedings.

25             THE COURT:  But he's not seeking declaratory relief

O8DAReyO

1    with respect to those proceedings.

2              MR. ZUCKERMAN:  Well, there is no other controversy of

3    sufficient immediacy to justify declaratory relief, so he has

4    to be targeting that criminal proceeding.  There's no other way

5    for him to bring a declaratory relief action at this juncture.

6    And that's why the declaratory relief action or claim should be

7    dismissed.

8              THE COURT:  With respect to the preliminary injunction

9    order, are you saying then that that portion of the order was

10   wrongly decided or you're saying we're now in a different

11   posture?

12             MR. ZUCKERMAN:  No.  I think we're in a different

13   posture.  I mean, what you have today is an ongoing -- the

14   reason that it's different, up until that point, he had not

15   brought a declaratory relief action.  I think his original

16   complaint said that he's specifically not bringing a

17   declaratory relief action, and he took that language out of the

18   amended complaint.  So now that's back in play.  That's the

19   difference.

20             THE COURT:  All right.  Why don't you touch briefly on

21   the CAPA issue and then I will hear from counsel for plaintiff.

22             MR. ZUCKERMAN:  The jurisdiction issue or the merits?

23             THE COURT:  Touch on both briefly.

24             MR. ZUCKERMAN:  Sure.  Plaintiff's CAPA claim presents

25   some supplemental jurisdiction issues aside from the other

O8DAReyO

1    supplemental jurisdiction issues that we've raised.  The city

2    charter does not grant plenary right to seek redress for an

3    alleged CAPA violation based on alleged rule making violations.

4         So plaintiff can only proceed by Article 78 of the

5    CPLR on his claim for injunctive relief on this claim.  But

6    most federal courts have declined to exercise supplemental

7    jurisdiction over Article 78 claims.  In fact, the Second

8    Circuit in *Carver* noted the split in district courts over

9    whether federal courts can even exercise supplemental

10   jurisdiction over Article 78 proceedings.

11        But, in any event, it would be an abuse of discretion

12   on *Carver* for the Court to exercise supplemental jurisdiction

13   over plaintiff's CAPA claim because it is an Article 78 claim

14   that raises an unresolved issue of state law and implicates a

15   significant state interest.  Thus, regardless of whether the

16   Court ultimately decides to hear the remainder of plaintiff's

17   state and local law claims, and we contend that the Court

18   should not exercise supplemental jurisdiction over any of the

19   state law claims, the Court should still not exercise

20   supplemental jurisdiction over plaintiff's CAPA claim.

21        Just briefly on the merits of the CAPA claim, the law

22   we cite stands for the proposition that if the enactment leaves

23   officers with discretion, as opposed to fixed principles, rule

24   making is not required.  Here, the policy states that officers

25   may order an individual recording in a precinct lobby to stop

O8DAReyO

```
1    recording.  If he or she does not, the officer should then
2    order the individual to leave.  If the individual does not
3    leave, the officer may take law enforcement action against him
4    or her.
5         So the officer's guidance under the policy is
6    discretionary, and thus, no rule making pursuant to CAPA is
7    required.
8         THE COURT:  Thank you.  All right, Ms. Oberdick.
9         MS. OBERDICK:  Good morning, your Honor.  May it
10   please the Court.  Meena Roldán Oberdick for plaintiff Sean
11   Paul Reyes.
12        We ask this Court to deny the city's motion to dismiss
13   in its entirety because it misstates binding New York Court of
14   Appeals and Second Circuit law.  It does not engage with the
15   facts as alleged in the complaint, and it turns on factual
16   disputes, which are not properly decided at this stage.
17        I would like to begin with the First Amendment claims,
18   addressing what standard applies to the right to record police
19   officers and why the tiered forum doctrine that applies to
20   speech and expressive rights is not appropriate in this
21   content.  Then I'll address the city's forum doctrine
22   arguments.  I would then like to move to the Fourth Amendment
23   addressing the probable cause arguments regarding trespass and
24   obstruction of governmental administration.  And, finally, I'll
25   address the statutory arguments under the Right to Record Acts
```

O8DAReyO

 1    and CAPA.

 2            So beginning with the First Amendment.  The First

 3    Amendment recognizes a right to record law enforcement

 4    activity.  This right has been recognized and strengthened

 5    across the nation over the last 20 years as cell phone

 6    recording as become ubiquitous and transform conversations

 7    about policing and policing activity.

 8            The first question that federal courts have confronted

 9    in deciding cases that implicate this right is what standard

10    applies.  And the majority of them have found that recording

11    law enforcement officers is not an exercise of speech or

12    expression in and of itself, although it is fundamental to the

13    public's later ability to gauge -- to engage in public debate,

14    which is speech.  It is rooted in an information gathering

15    right.

16            I want to address a few mis-characterizations of the

17    binding Supreme Court cases and the Second Circuit cases that

18    establish the contours of that right and explicitly hold that

19    forum analysis is not applicable in this context.  I'm speaking

20    of cases such as *Branzburg v. Hayes*.  I don't believe that was

21    in the briefings.  I can give the citations.  That's 408 U.S.

22    665, 1972, and companion case, *Houchins v. KQED*, 438 U.S. 1.

23    Both those are Supreme Court cases defining right to gather

24    information from any source by means within the law.  By

25    definition, the right is not defined by the nature of the

O8DAReyO

1    forum.

2            Defendant also cites cases in the Second Circuit,

3    including *Westmoreland v. CBS*.  That's cited in its brief.

4    That case actually does explicitly reject forum doctrine as

5    applied to broadcasting news.  And the Court specifically says

6    that the forum doctrine in this context is inapposite.

7    Likewise, *Whiteland Woods*, the Third Circuit case, also cited

8    in defendant's brief, is an information gathering right case in

9    I believe a City Hall.  And there, too, they explicitly reject

10   that forum analysis applies citing to the Second Circuit's case

11   in *Yonkers* and *Westmoreland*.

12           So the test that these Courts apply instead is

13   intermediate scrutiny.  It sounds like intermediate scrutiny

14   from tier forum doctrine, but it does not have a public forum

15   predicate.  The test is the following:  Restrictions on the

16   right to record police activity may be subject only to

17   reasonable time, place, manner restrictions that are content

18   neutral and narrowly tailored to serve a significant government

19   interest.

20           We are not arguing that the city cannot implement a

21   time, place, manner restriction on recording in its precincts

22   or anywhere.  But that's not what we have here.  What we have

23   here is an all out blanket ban that applies regardless of

24   whether the place is held open to the public 24/7 hours of the

25   day, or whether it is a private place, someone's private office

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O8DAReyO

within a facility.  It pays no attention to the place, to the

time, or to the manner of recording.  It doesn't care if

someone is recording in a manner that might obstruct the goings

on in a police precinct or whether someone is simply recording

in a peaceful manner.

THE COURT:  What would a narrowly tailored restriction

look like here?

MS. OBERDICK:  Sure.  I believe there's a good

example.  The U.S. Capitol Police have a pretty long detailed

policy about recording on U.S. Capitol grounds.  And there, for

example, they are largely implementing restrictions on

recording for safety purposes, as well as for just preserving

what goes on, the many activities that happen on capitol

grounds.  And their time, place, manner restrictions include

prohibitions on enhancement equipment.  So limitations on using

tripods, for example, because it obstructs foot traffic.

Limitations on the size of equipment, there's a lot of people

who come through this space so we don't want commercial film

crews and cameras.  There's also restrictions, place

restrictions.  So there's specific places that members of the

press or the public can stand if they're recording.  Designates

grassy areas for them, for example, rather than just allowing

them to go willy-nilly wherever they want.  So I think those

are good examples.

In addition, a huge emphasis of the analysis under

O8DAReyO

1    time, place, manner restrictions is whether there's meaningful

2    alternatives.  Here, the complaint clearly alleges that there

3    are no meaningful alternatives to information gathering within

4    police precincts.  We've noted as visible from the video as

5    well that the NYPD is recording 24/7, 24/7 within its

6    precincts, but that footage is not obtainable to the public.

7    We allege in our complaint statistics of how often the Civilian

8    Complaint Review Board has been able to obtain video evidence

9    from the NYPD.  And we show that 85 percent of the time, the

10    CCRB was unable to get the video evidence it was asking for.

11    And that was in 2020.

12         If the CCRB can't get video 85 percent of the time,

13    what is the public's success rate?  It's not a reasonable

14    alternative to expect a member of the public to hire an

15    attorney and engage in protected freedom of information

16    litigation just to be able to show what happened to him or her

17    in the context of the police precinct.  So there are no

18    meaningful alternatives to civilian recording in this context.

19         We also allege that the policy is not content neutral

20    at paragraphs 95 and 107.  Certainly we agree that on the

21    policy's face it applies to all facilities of the NYPD without

22    referencing the content of the recording.  But as applied as we

23    allege in the complaint, the recording ban is only applied to

24    the public lobbies where there's an implication that the

25    recordings will be used for accountability purposes, purposes

O8DAReyO

1    that have potential -- will be used to criticize the NYPD.  We

2    allege, and the Court must accept as true at this stage, a

3    quote at paragraph 51.  The NYPD bars recording in precincts to

4    control footage of civilian/officer encounters, and not for any

5    stated public safety purposes.  We also document the long

6    history of them targeting recording, specifically when the

7    recording is meant for accountability purposes.  So on that

8    ground, we also think it fails this test.

9            THE COURT:  In terms of the city's public safety

10   reasons for the policy, it sounds like you're saying I can't

11   take into consideration any of those because they're not stated

12   in -- or alleged in your complaint.  Is that true?  Aren't

13   there cases that say I can take into consideration sort of

14   common sense public safety reasons in deciding this issue?

15           MS. OBERDICK:  Certainly.  We agree that you can

16   consider the NYPD's stated interest.  However, the NYPD has a

17   burden to show that those interests are either reasonably or

18   narrowly tailored to serving its interests.  Importantly, we

19   also think that these are -- do rely on fact questions.  The

20   extent to which its stated purposes are not pretext, as we

21   allege, we believe that that is a factual question, and that

22   there are assertions in the record, that if they are proven to

23   be true, a reasonable jury could find that given the reasons

24   for the NYPD's policy are purely pretext.

25           In addition, we consider not just whether the NYPD has

O8DAReyO

1    implemented bans.  We look at the nature and the use of the

2    forum.  And as Captain Leone testified at the preliminary

3    injunction hearing, the best evidence of what goes on in a

4    precinct, the best evidence of how the public uses a precinct,

5    is contained in records within the possession of the NYPD.  So

6    the question of whether those interests are served or not, by

7    this policy, whether they're pretextual, those are fact-based

8    questions that we cannot decide based on the conflicting

9    evidence in the record at this stage.

10         Just very briefly on the city's forum analysis

11   arguments.  We believe these turn on fact disputes.  As I've

12   just said, these turn on the use and the intent of the

13   precincts.  I just quickly wanted to highlight *Askins v. DHS*.

14   That's a Ninth Circuit case cited in our brief.  That's one of

15   the cases that does apply forum doctrine to recording on police

16   officers at the border.  And I think it's telling that the

17   Ninth Circuit denied the government's -- the Department of

18   Homeland Security's motion to dismiss in that case given the

19   highly fact-based nature of determining whether their reasons

20   are sufficient.  And there, DHS's reasons were to protect

21   border security and the integrity of its checkpoint

22   infrastructure.  If those reasons aren't enough to win a motion

23   to dismiss at the federal level, I don't think the city's

24   reasons are sufficient here as a matter of law.

25         If I may, unless your Honor has more questions on the

O8DAReyO

1  First Amendment, I will move to the Fourth Amendment now.

2           The city's Fourth Amendment arguments I understand are

3  twofold, that it has probable cause or it had probable cause to

4  arrest Mr. Reyes for trespass, and then separately it had

5  arguable probable cause to arrest him for obstruction of

6  governmental administration or OGA.

7           So under trespass, I understand the city's primary

8  argument to be that it has a common law privilege as owner of

9  its property to define who can come in and eject those who do

10  not comply with the rules it puts in place.

11          Well, as a preliminary matter, whether probable cause

12  exists, as your Honor noted, is not a question of common law

13  privilege.  It is defined by state statutes.  And under the

14  state trespass statute, the question here is whether the

15  officer's order for Mr. Reyes to stop recording or to leave,

16  whether that was a lawful order.

17          Secondly, also as a preliminary matter, there is no

18  single common law privilege.  A lot of the cases the city cites

19  are cases in which private property owners certainly have

20  privilege over who comes in and out of their private property,

21  particularly homes.  But even if for private property owners,

22  there is no same privilege when you have a place of a public

23  accommodation obviously, or if when the government, as owner,

24  is holding a public place open to the public.  The standard for

25  when the government can eject someone under trespass for

O8DAReyO

1    entering and being on property that is otherwise held open to

2    the public is governed by binding New York Court of Appeals

3    case law that the city never mentions. *People v. Leonard*.

4    *People v. Leonard* is the New York Court of Appeals case in

5    which public university, SUNY Binghamton, issued a *persona non*

6    *grata* letter, ejecting an individual from a part of the

7    university campus that was otherwise open to the public.

8        That case directly forecloses the city's argument

9    here.  In that case, the government had argued that it did not

10   need to put forth any evidence about the lawfulness of its

11   ejection order, that the trial court should just assume the

12   lawfulness given that it is the owner of this property and has

13   a privilege.  The New York Court of Appeals explicitly rejected

14   that argument.  Property held open to the public, the public

15   has a presumed license to be on that place.  So it's the

16   government's burden, evidentiary burden, to show that the order

17   to leave was lawful.  And an order to leave will not be lawful

18   if it is predicated on or unduly burdens a statutory or a

19   Constitutional right.

20       So the city is effectively arguing exactly what is

21   foreclosed by *Leonard*.  They are asking you to apply a

22   presumption that their order to leave was lawful because of

23   this supposed common law privilege.  That's exactly what

24   *Leonard* says we cannot do.

25       Also, I just wanted to briefly address their argument

O8DAReyO

```
1   that we're asking this Court to interpret the Right to Record
2   Acts as superseding the Penal Code.  We are making no such
3   argument.  The Right to Record Acts have carve outs for
4   obstruction of governmental administration itself.  It has
5   carve outs for breaking the law.  We're not saying someone can
6   trespass on private property or go back into an officer's
7   private cubical beyond the place that is held open to the
8   public.  That's just not what we're arguing.
9           On obstruction of governmental administration quickly,
10  first, it's not clear to us that the doctrine of arguable cause
11  they're using to make this claim is applicable here.  That
12  doctrine usually comes up, or in my knowledge only comes up, in
13  the qualified immunity context.  Here, we are not seeking
14  damages.  We're not suing the individual officer.  We are
15  challenging an injunctive relief, the unlawfulness of a policy
16  as a whole.
17          So we don't really believe the OGA arguments are
18  relevant on that ground to begin with.  But even if they are,
19  the city has not shown the OGA elements were met in this case
20  or in the myriad of arrests under its unlawful policy.
21          There are three elements that would need to be in
22  dispute for this claim to hold.  The first is there needs to be
23  a physical interference.  The second is there needs to be an
24  intent to obstruct officers from carrying out their duties.
25  And then, third, that intent has to be targeted at a specific
```

O8DAReyO

```
 1    law enforcement operation.  The cases we cite in our brief make
 2    very clear that mere words, asking a question, is not enough to
 3    rise to the level of physical interference.  The majority of
 4    the cases we see here involve some conduct.  The accused
 5    getting in the way of law enforcement, physically, standing in
 6    between a police officer and an individual accused of a crime,
 7    or interjecting and constantly interrupting the officer as he's
 8    questioning someone else.  Here we don't have anything like
 9    that.  We have purely passive conduct of Mr. Reyes waiting in
10    line to get a complaint form in the public window of a lobby,
11    not speaking to anyone else, a very low voice, really just does
12    not rise to the level of physical interference.
13            Secondly, on intent, the city is asking this Court to
14    make a fact determination about Mr. Reyes' state of mind, which
15    it cannot do at this stage.  There's simply no way to read the
16    first amended complaint as alleging Mr. Reyes had an intent to
17    impede officers from carrying out their duties.  Quite the
18    opposite.  He made expressly clear to them that he wanted them
19    to just hand him a complaint form and then he would be on his
20    way.  So he wanted them to carry out their duties; not the
21    opposite.
22            And, lastly, as Judge August found in the Brooklyn
23    criminal proceedings related to the 75th Precinct arrest, the
24    city did not allege what specific law enforcement activity
25    Mr. Reyes allegedly was trying to interfere with.  Again, there
```

O8DAReyO

1    was just passive conduct.  Typically, in other cases, there has

2    to be an intent to try to impede or interfere with a specific

3    enforcement action.  For instance, someone's girlfriend is

4    getting arrested and they're trying to impede in that.  Or a

5    buy and bust operation where a young boy was trying to warn

6    people subject to that buy and bust operation that the police

7    are coming.  Here we have nothing of that sort.  So the OGA

8    arguments also are without basis.

9        THE COURT:  Why don't you turn to the state right and

10   city right to record portions of their motion.  Can you respond

11   to their argument that interpreting those laws in the way that

12   you suggest would result in absurd results, specifically with

13   respect to recording in state courthouses and in private homes.

14       MS. OBERDICK:  Certainly.  So the Right to Record Acts

15   are passed after binding cases like *People v. Leonard* and the

16   number of federal circuit court cases that we cite in our brief

17   that define the contours of how the Court is supposed to

18   approach these heavily fact-based questions and balance

19   interest here.  So the courthouse is a good example.  The

20   Second Circuit has actually directly decided the question of

21   deciding in courthouses.  That's in 1984.  That's the

22   *Westmoreland v. CBS* case.  And in that case, after rejecting

23   that forum doctrine applies, the Court engaged in the test that

24   we are asking for.  Essentially a time, place, manner

25   restriction test.  And there, the Court found that the public's

O8DAReyO

1    interest and information gathering is already adequately

2    represented by the alternative mechanisms we have in place.  We

3    have stenographers and court reporters documenting every single

4    word that is said in the courtroom, and those transcripts are

5    publicly available to anyone and everyone.  We have -- because

6    pictures are worth a thousand words -- we also allow people to

7    enter with sketch pads and professionals frequently do make

8    drawings of the parties and the judges in a litigation

9    proceeding.

10           So the Court found that those, in this context, were

11   adequately representative of the public's interest here.  And

12   as I mentioned before, we just don't have those same types of

13   alternative methods in place in the precinct.  Conversely, the

14   Court weighed the government's interest in regulating

15   broadcasting in courtrooms and it found that those interests

16   were sufficient and significant.  As of 1984, it found that the

17   Judge's interest in maintaining decorum in the courtroom,

18   protecting jurors from being unduly influenced, it has a long

19   paragraph at the very end of that case where it lists out the

20   many, many significant interests that judges have.  So it's a

21   fact-based test.  And our response to the city's argument about

22   this parade of horribles is that we apply this balancing test.

23   *People v. Leonard*, also, it defines the contours of when a

24   government has a right to eject someone for trespass.  That is

25   the barriers that we have in place.

O8DAReyO

1          And when it comes to recording in a private home,

2     certainly the NYPD is not arguing that it has a privilege to

3     ban homeowners from recording law enforcement when they come to

4     the door.  Certainly, if you have a right to be in your home or

5     right to be in your friend's home, you may record the police

6     when they come and engage in activity.  But that doesn't give

7     you a right to break the law and trespass into someone else's

8     home, which you do not know and you have no privilege to enter

9     that place.

10          So we believe that there really is no parade of

11     horribles and that the plain meaning text and intent of the

12     legislature should hold as this Court found in its preliminary

13     injunction motion.

14          I'm sorry.  Go ahead.

15          THE COURT:  Can you address next your response to the

16     city's argument with respect to Younger?

17          MS. OBERDICK:  Sure.  I'd like to repeat the same

18     arguments we made at the preliminary injunction stage, which is

19     that any decision by this Court is merely persuasive, not

20     binding on a state criminal court.  You know, Judge August in

21     the Brooklyn Criminal Court already issued a decision.  She

22     engaged independently with the facts and the law before her.

23     She developed the record.  There is absolutely no indication

24     that she was either influenced by this Court or felt compelled

25     to be bound by this Court.  There's simply no argument that

O8DAReyO

```
 1    that calculus would be different if the city were to appeal.

 2    Currently where we stand, we understand the city has notice and

 3    intent to appeal, but has not yet done so.  We don't believe

 4    that there's any reason that an appeal would be different from

 5    the underlying trial court's decision.

 6         THE COURT:  All right.  In terms of CAPA, are you

 7    purporting to bring the CAPA claim via Article 78 or is it --

 8    under what method are you bringing this claim?

 9         MS. OBERDICK:  Sure.  We do not bring this claim via

10    Article 78.  The city cites to several cases in which those

11    claims were brought via Article 78.  Not one of those cases

12    establishes that Article 78 is the sole mechanism for bringing

13    these claims.  We cite to at least one case where a CAPA claim

14    survived the summary judgment phase in the Southern District of

15    New York.  That's *New Jersey Limousine Association v. Lusk*,

16    1991 WL 143710.  We cite I think a few other cases in S.D.N.Y.

17    So no, we are not arguing this is an Article 78 case, nor that

18    it is the only mechanism for bringing this claim.

19         THE COURT:  In that case, in Lusk, did the Court

20    specifically address whether there's a private right of action

21    under CAPA?

22         MS. OBERDICK:  It did not explicitly.  All it found is

23    that the opposing party did not meet its burden for the

24    purposes of summary judgment and the claims survived.  But I do

25    not know if it was directly briefed or argued.
```

O8DAReyO

1          THE COURT:  All right.  So why should I exercise

2    supplemental jurisdiction over this claim?

3          MS. OBERDICK:  Over the CAPA claim.  Well, firstly, we

4    do believe we have strong federal Constitutional claims and

5    there is a clear nucleus, shared nucleus, of operative facts.

6    So for the prudential reasons of efficiency, it makes sense to

7    hear those claims together.

8          You know, in the circumstance where no federal claim

9    were to go forward at all, we're just looking at the CAPA

10   claim, we would still think that it would not be an abuse of

11   discretion to keep the claim given that there's a live

12   preliminary injunction over the state law claim given that we

13   have had this case here in this Court for quite sometime now,

14   have started discovery.  However, we would also recognize that

15   in the circumstance where there is no federal claim, the common

16   practice would be to send any remaining claims to state court.

17         THE COURT:  Okay.  Thank you, Ms. Oberdick.

18         MS. OBERDICK:  Thank you, your Honor.

19         THE COURT:  All right.  Well, thank you all for your

20   arguments.  This was incredibly helpful.  I anticipate making a

21   decision soon.

22         And is there anything else for us to discuss with

23   respect to this case, Ms. Oberdick?

24         MS. OBERDICK:  No, not at this time.

25         THE COURT:  Mr. Zuckerman?

O8DAReyO

 1            MR. ZUCKERMAN:  No, your Honor.

 2            THE COURT:  Thank you all again for excellent

 3    argument, and we are adjourned.

 4            (Adjourned)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25